**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Jerry KENNEY, Defendant–Appellant.**

**No. 86–1296.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 14, 1989.

Decided Aug. 14, 1990.

316

Francisco Leon, Donau & Bolt, Tucson, Ariz., for defendant-appellant.

Joanne Y. Maida, Asst. U.S. Atty., Seattle, Wash., for plaintiff-appellee.

Before BRUNETTI, KOZINSKI and NOONAN, Circuit Judges.

BRUNETTI, Circuit Judge:

The appellant was convicted on five counts of a seven-count indictment charging him with mail fraud, interstate travel with the intent to facilitate an unlawful activity, and conspiracy for his role in a kickback scheme involving transactions related to the Washington Public Power Supply System ("WPPSS"). He seeks reversal on the basis of the court reporter's loss of a portion of the trial transcript, the disqualification of trial counsel, the testimony of an Assistant United States Attorney, and the Supreme Court's decision in *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). We reverse the appellant's mail fraud convictions on the basis of *McNally*, and affirm on the remaining counts.

## FACTS AND PROCEEDINGS BELOW

This case arose out of a $12.3 million fixed-cost fire protection contract between WPPSS and Cosco/Zurn Industries, Inc. ("Cosco"). The appellant was an independent sales representative for several companies that were involved in the WPPSS project, including Cosco. While the appellant's primary responsibility with Cosco was securing contracts with WPPSS, he was also involved in finding subcontractors for Cosco to perform work related to its contracts with WPPSS. These subcontractors would pay commissions directly to the appellant.

Control–X Corporation was a construction company that entered subcontracts with Cosco to perform painting services and provide fire equipment hangers. The appellant was instrumental in arranging these contracts between Cosco and Control–X, which led to the indictment against him. Walter Marsh was an owner of Control–X who testified for the government. Marsh claimed that the appellant informed him that Gerald Silverman of Cosco would have to be "taken care of" if Control–X were to be awarded a contract.

Marsh testified that he understood this to be a solicitation for a bribe. He and the appellant later traveled from Washington to Los Angeles to meet with Silverman and discuss the proposed contracts. At this meeting the appellant participated in negotiations, which included discussion of a payment of $10,000 to Silverman. The meeting concluded with the signing of a painting contract for $825,000, which included an advance payment to Control–X of $50,000 that was characterized as a mobilization fee. The appellant's commission was ten percent of the contract price plus twenty percent of any subsequent change orders. Additionally, Nor–Tec, a partnership in which the appellant had an interest, was to receive one-half of the mobilization fee. Marsh, in turn, was to receive one-half of Nor–Tec's share of the mobilization fee. Marsh later met with Silverman in Pasco, Washington, and paid him $10,000 in currency. Control–X contracted with Long Painting Company to perform the work under the contract for $312,000.

Negotiations for the hanger contract were similarly consummated, except that the appellant did not travel to Los Angeles with Marsh. Again, Silverman was to receive $10,000 and Control–X was to receive a $50,000 advance payment. The appellant's commission was the same. Nor–Tec was not included in this transaction. Further developments, which are not relevant to this appeal, led to indictments against Silverman and the appellant. Marsh received immunity for his testimony against the appellant.

Counts I through III of the indictment charged the appellant with mail fraud in violation of 18 U.S.C. § 1341 and 1342. Counts IV through VI charged violations of the Travel Act, 18 U.S.C. § 1952, and count VII charged the appellant with conspiracy in violation of 18 U.S.C. § 371. Count V was later dismissed. After a jury trial the appellant was found guilty on counts II, III, IV, VI, and VII.

## DISCUSSION

### A. *The Lost Transcript*

 The appellant's first argument is that the court reporter's loss of a portion of the trial transcript prevents adequate review of the record and requires us to remand this matter for a new trial. This loss, the appellant argues, constitutes a violation of 28 U.S.C. § 753(b), which re-

quires the court reporter to keep a verbatim record of the proceedings. The lost portion of the transcript contains a portion of the cross examination and redirect examination of Walter Marsh.

The appellant contends that this portion of the transcript contains rulings by the trial court limiting cross examination that constitute an abuse of discretion. A substitute statement, however, was prepared and approved by the trial court in accordance with Rule 10(c) of the Federal Rules of Appellate Procedure, which permits the substitution of a statement that has been prepared from the memories of the parties. Rule 10(c) provides:

> If no report of the evidence or proceedings at a hearing or trial was made, or if a transcript is unavailable, the appellant may prepare a statement of the evidence or proceedings from the best available means, including the appellant's recollection. The statement shall be served on the appellee, who may serve objections or proposed amendments thereto within 10 days after service. Thereupon the statement and any objections or proposed amendments shall be submitted to the district court for settlement and approved and as settled and approved shall be included by the clerk of the district court in the record on appeal.

Statements were prepared by both the appellant and the appellee from their recollections of the testimony that was contained in the lost transcript. The trial court resolved the differences in the proposed statements and approved as settled the statement that was prepared by the government, finding that it "comport[ed] with the recollection and trial notes of the Court." There is no indication that the appellant raised any objection to this recapitulation until now.

Both parties rely on *United States v. Piascik*, 559 F.2d 545 (9th Cir.1977), *cert. denied*, 434 U.S. 1062, 98 S.Ct. 1235, 55 L.Ed.2d 762 (1978), which involved a court reporter's failure to record closing arguments in a criminal trial. The *Piascik* court declined to follow a fifth circuit rule that required reversal and a new trial in a

similar situation, instead relying on *Brown v. United States*, 314 F.2d 293 (9th Cir. 1963), which held that "[t]he appropriate procedure is to vacate the judgment and remand for a hearing to determine whether appellant was prejudiced by the error in failing to record the arguments." *Id.* at 295. Despite the fact that no Rule 10(c) hearing was held to reconstruct the record, Piascik's convictions were affirmed because defense counsel waived the recording of closing arguments and because the court concluded that any error alleged was harmless. *Piascik*, 559 F.2d at 550.

Here the trial court reconstructed the record in accordance with Rule 10(c). The appellant had the opportunity to raise timely objections to the substituted portion of the record, and he failed to do so. Any violation of section 753(b) has been remedied, and the appellant will not be permitted to contest the validity of the portion of the record that was substituted under Rule 10(c). Moreover, there is nothing in the substituted record to indicate trial errors occurred that would require reversal. The appellant has failed to show that any error was committed in the lost portion of the record, he has failed to show that the record in its present form is insufficient to review any claims of error, and he has failed to show that he has been prejudiced by the partial loss of the record. *See Commercial Credit Equipment Corp. v. L & A Contracting Co.*, 549 F.2d 979, 980 (5th Cir.1977). This argument fails.

#### B. *The McNally Instruction*

■ The appellant argues, and the appellee concedes, that the jury was improperly instructed, under the Supreme Court's recent decision in *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987) regarding the elements of mail fraud, 18 U.S.C. §§ 1341–42. The parties are correct, and the appellant's convictions under counts II and III must be reversed.

The *McNally* Court limited the scope of mail fraud to the protection of property rights and held that a defendant could not be convicted of mail fraud for participating in a scheme to defraud citizens of their

intangible right to honest government. *McNally*, 107 S.Ct. at 2882. In the present case the jury was allowed to find the appellant guilty of mail fraud if they concluded that the appellant "devised or intended to devise a scheme ... to defraud Cosco ... or Zurn's stockholders of their right to the loyal, faithful, and unbiased services of [the appellant]." *McNally* was decided after the appellant was convicted, but the *McNally* rule is fully retroactive and must be applied to this case. *See United States v. Mitchell*, 867 F.2d 1232 (9th Cir.1989). Accordingly, the appellant's convictions for mail fraud under counts II and III of the indictment are reversed.

■ The appellant further argues that his remaining convictions for Travel Act violations and conspiracy must also be reversed for the same reason. This argument fails. Mail fraud did not support either conviction, nor were these convictions affected by the defective instruction. The jury was specifically instructed that bribery was the underlying offense in counts IV and VI under the Travel Act. On count VII for conspiracy the jury answered a special verdict form in the affirmative when asked whether the object of the conspiracy was the corrupt influencing of Gerald Silverman. Thus, the defective *McNally* instruction did not affect the Travel Act or conspiracy convictions.

### C. *Testimony of the Assistant United States Attorney*

■ The appellant next argues that his due process rights were violated because an assistant United States Attorney, Bruce Carter, was permitted to testify as part of the government's case-in-chief. The appellant claims that permitting Carter to testify violated the advocate-witness rule and deprived him of a fair trial because Carter participated in the investigation and preparation of the case. A court's control over the manner of questioning at trial is reviewed for an abuse of discretion. *United States v. Taylor*, 716 F.2d 701, 710 (9th Cir.1983).

In conducting the cross-examination of Gerald Silverman, counsel for the appellant suggested that Silverman was encouraged by Carter to create facts favorable to the prosecution, and that Carter had received favorable publicity from the investigation that would enhance his political ambitions. Defense counsel suggested that Silverman's cooperation in the investigation was the result of the government's promise to recommend lenient sentencing. Carter was thereafter called by the prosecutor to rebut these suggestions.

Carter testified that no promises or bargains were made with Silverman regarding leniency in the WPPSS matter, and that there were no political motivations behind the decision to prosecute the case. Carter made the following statement: "I told Mr. Egan that [immunity for Silverman] was unacceptable to us; that we had serious allegations of—relating to Mr. Silverman, and expected to pursue those; and we thought in all likelihood he would receive a sentence of imprisonment for the conduct we had uncovered."

Carter's statements were admissible. The statements regarding Carter's political motivation for bringing the case were relevant to the implied charges made against the government. Further, Carter's statements regarding what he said to Mr. Silverman's attorney about immunity were also admissible, non-hearsay statements. The testimony was offered to establish that Mr. Silverman *knew* he would not be given immunity by the government and, therefore, had no motive to lie to gain points with the prosecutor. The statement was not offered to prove the truth of the matter asserted and, thus, it was not hearsay. Fed.R.Evid. 801(c).

■ Further, the admission of Carter's testimony did not violate the rule of *United States v. McKoy*, 771 F.2d 1207 (9th Cir. 1985). In *McKoy*, the defendant was on trial for conspiracy to transport stolen goods. His defense was that he had been out of the state when the crime occurred and knew nothing about a load of stolen goods. *Id.* at 1209. After defense counsel questioned a co-defendant who was testifying as a government witness regarding his plea agreement, the government called a

former prosecutor, who had originally been responsible for the defendant's prosecution, to elaborate on the circumstances surrounding the negotiations.

In response to a question about the negotiations, the former prosecutor said that he "felt [that] the case was an extremely strong case against all defendants." *Id.* at 1210 n. 1. McKoy was convicted, and on appeal the conviction was reversed because the statement that the government had an "extremely strong case against [McKoy]" violated the rule that a prosecutor may not express a personal opinion of the defendant's guilt or his belief in the credibility of a witness. *Id.* at 1210–11.

Carter did not implicate Kenney in his testimony regarding Silverman. Rather, Carter spoke of Silverman's guilt, which was not a contested matter as the jury was aware. Carter's testimony did not express a personal opinion of Kenney's guilt. Therefore, it was admissible under *McKoy*.

■ Further, although Carter participated in the investigation and preparation of the case, the jury was aware of his association with the prosecutor and it was twice instructed that it could consider his bias in crediting his testimony. "The mere fact that a witness holds an office of public trust should [not] disqualify him as a witness...." *United States v. Cerone*, 452 F.2d 274, 288 (7th Cir.1971), *cert. denied*, 405 U.S. 964, 92 S.Ct. 1168, 31 L.Ed.2d 240 (1972). Similarly, the mere fact that Carter was associated with the prosecution did not disqualify him as a witness when his testimony became necessary to rebut implied charges of improper influence on a prosecution witness.

■ Carter's other testimony regarding Silverman's assistance did not constitute vouching for Silverman's credibility. During Silverman's testimony, Kenney's counsel sought to establish the political motivation of the United States Attorney's Office in prosecuting this case. Assistant United States Attorney Carter's replies to this line of questioning were not statements about his belief in the strength of the case; rather, his answers simply showed that the prosecution of this case was a routine matter that was not politically motivated.

Because Carter did not implicate Kenney as the prosecutor in *McKoy* did, or vouch for Silverman's credibility, his statement was properly admitted to rehabilitate Silverman's testimony. We conclude that the testimony of Carter did not deprive the appellant of a fair trial, and the trial court's decision to permit him to testify as a witness was not an abuse of discretion.

### D. *Disqualification of Trial Counsel*

On the government's motion the trial court disqualified the appellant's trial counsel after finding a "substantial potential for conflict" in the fact that appellant's retained counsel was simultaneously representing the appellant and Russell Lindsay, a business associate of the appellant and the subject of another grand jury investigation. Both the appellant and Lindsay objected to the disqualification and filed affidavits attempting to waive any conflict of interest. The trial court found the waivers to be inadequate and refused to allow joint representation, and the appellant now claims that this was an error that requires reversal.

■ We review a trial court's pretrial disqualification of counsel for an abuse of discretion. *See United States v. Wheat*, 813 F.2d 1399, 1401 (9th Cir.1987) (denial of substitution request), *aff'd*, 486 U.S. 153, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988). The trial court must be given "substantial latitude" in refusing waivers of potential conflicts of interest. *Wheat*, 108 S.Ct. at 1699.

■ The record indicates that the government filed a sealed affidavit that gave the factual basis underlying its belief that the appellant possessed information relevant to an investigation of Lindsay. Even though attempts at plea bargaining had failed, the trial court found a substantial potential for a conflict of interest in that the appellant or Lindsay might change their minds or further developments would cause appellant to reconsider and plead guilty. On this basis the trial court denied

the multiple representation during an open hearing.

*United States v. Thompson*, 827 F.2d 1254, 1257 (9th Cir.1987), recognizes that in our system, adversary procedures are the general rule and ex parte examinations are disfavored. Adversary proceedings protect the defendant's due process rights by providing the defendant a chance to explain or rebut the prosecution's arguments. *Id.* at 1260–61. Thompson was denied this right because the district judge conducted an entirely in camera, ex parte proceeding to determine a prosecutor's motive in excluding minorities from a criminal jury. However, Kenney's due process rights were not similarly violated by the judge's in camera inspection of the prosecution's sealed affidavit because, before disqualifying Kenney's counsel, the trial judge held a hearing that was open to Kenney. We have reviewed the sealed affidavit and have concluded that it did not add substantially to what was said at the hearing. It merely provided a more detailed account of the government's position; Kenney's lack of access to it did not deny him the ability to dispute the government's position. This satisfied the adversarial process because it allowed Kenney to dispute the prosecutor's allegations.

The government spelled out that its reason for seeking disqualification was that there was reason to believe that at some point either Kenney or Russell Lindsay, both of whom were represented by Schwartz, would want to cooperate with the government. Schwartz had represented Lindsay for 14 months, Kenney for two. He had arranged for both Lindsay and Kenney to execute waivers of the potential conflict. After argument and explicitly relying on what she "had heard," Judge Rothstein ruled that the potential for conflict was great and that the waivers were unsatisfactory. There is no indication that Judge Rothstein relied on information not available to Kenney.

The appellant argues that the trial court erred in disqualifying counsel because there was no showing that an actual conflict of interest existed. This assertion misapprehends the appropriate test in this situation. An actual conflict must be shown only when the appellant is attacking a conviction on appeal or in habeas proceedings on the basis of an alleged conflict of interest. *See Cuyler v. Sullivan*, 446 U.S. 335, 346–47, 100 S.Ct. 1708, 1717, 64 L.Ed.2d 333 (1980). Here the potential for a conflict of interest was sufficient. Were it otherwise "trial courts confronted with multiple representations [would] face the prospect of being 'whip-sawed' by assertions of error no matter which way they rule." *Wheat*, 108 S.Ct. at 1698.

The appellant has not disputed that the potential for a conflict of interest was present. Defense counsel offered to "gladly step aside" if the government would drop the felony charges against the appellant and let him plead to a misdemeanor. Defense counsel knew that Lindsay was the subject of an investigation, he knew that the appellant was a business associate of Lindsay, and he knew that the government was seeking information from both Lindsay and Kenney about the other. A conflict, or at least the potential for a conflict, arose when defense counsel rebuffed the government's attempt to approach the appellant regarding information about Lindsay. The same conflict was apparent when defense counsel informed the government that if Lindsay were subpoenaed to appear before the grand jury, he would invoke his fifth amendment right and refuse to testify.

The government had approached appellant several times to obtain his cooperation as part of a plea agreement to give testimony against other persons. The possibility for a plea agreement did not appear to be out of the question; in fact the government had already made at least one offer that was not acceptable to the appellant. Had further plea negotiations been undertaken defense counsel would have been unable to represent either client without compromising the interests of the other. Under the circumstances the trial court did not abuse its discretion in disqualifying trial counsel on this basis. *See id.* at 1699.

Although the judge did not set out all the factors she considered in disqualifying counsel, she did state that (1) the relationship between Kenney and Schwartz was not so advanced that forcing Kenney to find new counsel would be damaging to his defense; (2) Lindsay was not at the hearing, making it impossible to look into his waiver and his understanding of it; and (3) even though both clients claimed not to have anything useful to the government, they could not tell what might be useful and counsel could not advise both of them about testifying against the other without a severe conflict of interest.

The judge, however, did not explain why she believed Kenney and Lindsay might end up as witnesses against each other. Were we to affirm on the basis of such an incomplete statement, we would be forced to affirm all disqualifications so long as the Government could invent a plausible rationale on appeal. Nonetheless, the district judge's expression of her reasoning, the transcript of the hearing and the sealed affidavit together persuade us that there was reason to suspect a future conflict of interest in this case and to assure us that the judge did not abuse her discretion in disqualifying counsel. A more detailed explanation of the reasoning and the factors taken into account, however, would have been helpful.

### E. *The Good Faith Advice of Counsel Defense*

■ As part of his defense the appellant asserted that when he learned of the financial arrangement between Silverman and Marsh, he consulted his attorney about the legality of the transaction, which he characterized as an interest-free loan. The attorney testified that he advised the appellant that he did not think a loan or a gratuity between Silverman and Marsh would be illegal, but to stay as far clear of it as possible. The appellant requested a jury instruction that his good faith reliance on the advice of counsel would constitute a defense to the bribery charge. The trial court rejected this proposed instruction.

The trial court's ruling was correct. In order to qualify for an advice of counsel instruction the appellant must show that there was full disclosure to the attorney of all material facts, and that he relied in good faith on the attorney's recommended course of conduct. *United States v. Ibarra–Alcarez*, 830 F.2d 968, 973 (9th Cir. 1987). The appellant never advised counsel that the $10,000 was intended to be a kickback or bribe; if he had it is highly unlikely that counsel would have advised him that the payment would be legal. The appellant testified that he was aware of the illegality of kickbacks and bribes, and that he did not seek the advice of counsel regarding that situation.

The jury was instructed on the elements of bribery and they were free to consider whether a loan or an illegal kickback was contemplated by the parties. Based on the appellant's contention throughout the trial that he was unaware of any arrangement for a kickback or bribe, the trial court properly rejected the appellant's proposed instruction relating to reliance on the advice of counsel.

### CONCLUSION

The appellant's convictions for mail fraud under counts II and III of the indictment are reversed. The remaining convictions for violations of the Travel Act and conspiracy are affirmed.

AFFIRMED IN PART AND REVERSED IN PART.

KOZINSKI, Circuit Judge, dissenting:

While I agree with much of the court's disposition, I am unable to join part C thereof. Having an Assistant U.S. Attorney who worked on the case testify before the jury is almost always an unwise and perilous exercise as it raises serious temptations for prosecutorial overreaching. In this case the temptation proved too great; it denied the defendant a fair trial.

There are two things a prosecutor may not do while testifying. The first is vouch for a witness; the second is express a personal opinion on the defendant's guilt or the strength of the case against him. *United States v. McKoy*, 771 F.2d 1207,

1210–11 (9th Cir.1985). In this case Assistant U.S. Attorney Bruce Carter did both.

A careful reading of the record finds Carter testifying that Silverman, a key government witness, was cooperative, RT 554–55, that he never changed his story, RT 551–52, and that the U.S. Attorney's Office routinely verifies the statements of its witnesses, RT 553–54. Carter stopped just short of pinning a Boy Scout Merit Badge on Silverman; his accolades could not help but persuade the jury that they ought to believe Silverman because an experienced and efficient prosecutor like Carter found him credible. *See McKoy,* 771 F.2d at 1211.

Moreover, Carter's prior statement that Kenney was involved in the scheme to defraud WPPSS was read to the jury, RT 482, and Carter testified that he would have brought the case against Kenney on these facts, RT 562. Few jurors would be unimpressed that Carter, the veteran Assistant U.S. Attorney who investigated the case, believed that the case was meritorious and that Kenney was guilty. *See McKoy,* 771 F.2d at 1211.

I cannot agree that the defendant opened the door to Carter's testimony by accusing the U.S. Attorney's Office of having political motivations or improperly encouraging Silverman to change his testimony. As I read the record, the issue of political ambitions arose because Silverman tried to convince Kenney to confess by telling him that the Assistant U.S. Attorney was ambitious and would eventually get him; the defense contended that Kenney's consistent denial of wrongdoing in the face of such pressure tactics demonstrated his innocence. And the record reveals only one defense question—out of hundreds of pages of cross examination—which might conceivably suggest that the Assistant U.S. Attorney encouraged the witness to change his testimony; and the witness' answer made it clear that the Assistant U.S. Attorney had not. RT 435–36.

Even if the door had been opened for Carter to deny the charges, it was open to direct rebuttal of the charges only. Rather than sticking to rebutting the charges, Carter added assessments of the strength of the evidence and the consistency and credibility of a witness, issues which lay well beyond the supposedly open door and about which his opinion was inadmissible and prejudicial.

The simple fact is that an ethical lawyer will never call to the stand a witness he knows is lying; he will also hesitate to bring a case he believes lacks merit. When the opposing side attacks the credibility of the witness or the strength of the case, there is an implicit attack against the integrity of the lawyer, who then wants nothing better than to get on the stand and tell the jury how much faith he has in the witness or the case. Our system just doesn't allow for such a performance, particularly in a criminal case.

Cases like this one put defense lawyers in a real dilemma: How far can you go toward impeaching the prosecution's witness before you find yourself Carterized, as happened here? If normal impeachment of a prosecution witness—which sometimes involves suggestions that the witness might be fibbing—gives an excuse for putting the prosecutor on the stand to tell just how upright the witness really is, criminal trials will be reduced to a credibility contest between the prosecutor and the defendant. The prosecutor must prove the defendant guilty beyond a reasonable doubt; he may not testify to it.

Here, the prosecutor should have refrained from offering himself as a witness; failing that, the district court should have rejected his testimony; *failing that,* the district court should have limited his testimony to direct rebuttal of matters raised by the defense; failing that this court should reverse Kenney's conviction. I fear that all of these successive failings have denied Kenney a fair trial. I must dissent.