UNITED STATES of America, Appellee,

v.

**Reginald Pierre BEASLEY, Appellant.**

UNITED STATES of America, Appellee,

v.

**Oliver Lawrence BEASLEY, Appellant.**

Nos. 95–3362, 95–3510.

United States Court of Appeals,
Eighth Circuit.

Submitted June 12, 1996.

Decided Dec. 18, 1996.

Rehearing and Suggestion for Rehearing En Banc Denied Jan. 22, 1997.

1442

**1443**

§§ 5841, 5845(a)(2), and 5861(d) (1994), and Oliver Beasley was found guilty of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g) (1994). The District Court sentenced Reginald Beasley to 447 months imprisonment and Oliver Beasley to 438 months imprisonment. Both defendants appeal their convictions. We affirm.

## I.

This case arises out of the events surrounding two bank robberies in the Minneapolis area in the fall of 1994. The following is a summary of the facts material to the issues raised on this appeal.

At approximately noon on October 13, 1994, three masked men, each brandishing a firearm, robbed the TCF Bank in Brooklyn Center, Minnesota. A man wearing a rubber "President Clinton" mask and armed with a double-barreled sawed-off shotgun and a man wearing an "old man" mask and armed with a semi-automatic pistol ordered customers to the floor and instructed the tellers to empty the cash from the teller drawers. Each man repeatedly threatened the lives of bank customers and employees. A third robber, wearing a "monster" or "Godzilla" mask, terrorized bank customers and employees in the bank's lobby.

Police officers arrived on the scene to witness the robbers leaving in a brown car. As the getaway car accelerated past the police officers, the robbers fired shots from a handgun and a shotgun. After seeking cover inside their squad car, the officers then proceeded after the robbers, following them into a nearby apartment complex parking lot. After momentarily losing sight of the getaway car, the officers saw two of the robbers running away from the getaway car, now parked in front of one of the apartment buildings. Defendant Reginald Beasley was found hiding on the second-floor balcony of that apartment building. He was wearing the pants and shoes that bank surveillance cameras had captured on the robber with the "President Clinton" mask. Next, officers seized Dale Owens, the robber wearing the "Godzilla" mask, after he tried to escape

Paul Engh, Minneapolis, MN, argued, for Reginald Beasley.

L. Marshall Smith, St. Paul, MN, argued, for Oliver Beasley.

Michael W. Ward, Minneapolis, MN, argued (Mark D. Larsen, on the brief), for appellee.

Before BOWMAN, HEANEY, and BEAM, Circuit Judges.

BOWMAN, Circuit Judge.

Reginald Beasley and Oliver Beasley appeal from a final judgment entered in the District Court[1] finding them guilty upon a jury verdict of one count of conspiring to commit bank robbery, in violation of 18 U.S.C. §§ 371, 2113(a), (d) (1994); two counts of armed bank robbery, in violation of 18 U.S.C. §§ 2, 2113(a), (d) (1994); and four counts of use of a firearm in a crime of violence, in violation of 18 U.S.C. §§ 2, 924(c)(1) (1994). Additionally, Reginald Beasley was found guilty of possessing an illegal firearm, in violation of 26 U.S.C.

[1]. The Honorable David S. Doty, United States District Judge for the District of Minnesota.

from backup officers into a locked apartment building.[2] Defendant Oliver Beasley was apprehended a few minutes later. After diving through the window screen of one of the apartments and running through the apartment into the building hallway, Oliver Beasley was arrested trying to leave the building. Officers later found a semi-automatic pistol on an interior stairwell of the building.

The getaway car had been stolen earlier that morning. Just in front of the abandoned getaway car, police recovered a .380 semiautomatic pistol. A government witness testified that he sold this gun to Reginald Beasley. Inside the car police found masks of "President Clinton," an "old man," and "Godzilla," spent shell casings, and a sawed-off shotgun. Two human hairs were found in the "old man" rubber mask. DNA testing using the polymerase chain reaction (PCR) method revealed that the DNA profile of the hairs found in the mask matched that of Oliver Beasley.

On the morning of September 22, 1994, several weeks prior to the robbery of the TCF Bank, the First Bank branch in Brooklyn Park, Minnesota, was robbed by two men, each wearing a ski mask with eye holes cut out. One man carried a sawed-off shotgun and the other a semi-automatic pistol. Each robber threatened bank customers and employees at gunpoint before leaving with approximately $10,000 in cash.

Shortly after the robbery, police found the robbers' getaway car in the parking lot of a nearby apartment complex. The getaway car, stolen earlier that morning, was found abandoned next to the apartment building of Oliver Beasley. Almost one month later, a box of .380 ammunition, two ski masks, a pair of sunglasses from the stolen vehicle, and a pair of dark gloves were discovered in the elevator shaft of Oliver Beasley's apartment building. Government witness Tracy Wilson testified that the ski masks looked similar to the masks that Reginald Beasley and Shenethia Davis, Reginald Beasley's girlfriend at the time, had made in Wilson's presence four months before the First Bank robbery. Wil-

son testified that he last saw the masks in the possession of Reginald Beasley. Surveillance cameras at First Bank depicted two men wearing ski masks and dark cloth gloves similar to the masks and gloves recovered from the elevator shaft and carrying firearms similar in characteristics to those recovered after the TCF bank robbery. Furthermore, Davis testified that defendants informed her of their intent to go to Minnesota three days before the First Bank robbery and that defendants returned to East St. Louis, Illinois, the day after the robbery with $4,000 in cash.

## II.

For reversal, both defendants argue that: (1) a letter from the United States Attorney's office admitted into evidence was hearsay and it improperly vouched for Davis's testimony; (2) admission of a prior consistent statement of Davis was erroneous; (3) the trial court erred in admitting evidence of the masks allegedly worn by defendants during the First Bank robbery; (4) the evidence is insufficient to support the jury's verdict as to the First Bank robbery; (5) the trial court committed plain error in instructing the jury as to the definition of "use" in 18 U.S.C. § 924(c) (1994); and (6) the trial court erred in not exercising its supervisory powers over the United States Attorney and dismissing or modifying the indictment. In addition, Oliver Beasley contends that (1) DNA evidence based on PCR testing should not have been admitted; (2) the trial court abused its discretion in denying his motion to sever; and (3) the trial court should have granted his motion for mistrial after it erroneously read to the jury, as part of the reading of the indictment, his prior felonies.

## III.

First, we address the arguments made only by Oliver Beasley.

### A.

█ Oliver Beasley argues that the District Court erred in admitting DNA evidence

---

**2.** Dale Owens was tried separately in federal district court and sentenced to 183 months imprisonment.

of two hairs found in the "old man" mask worn during the TCF robbery. The mask was left in the getaway car when, following the TCF robbery, the suspects fled the car on foot. Before trial, the District Court conducted an evidentiary hearing concerning the admissibility of DNA evidence using the polymerase chain reaction (PCR) method of DNA typing. At the close of this hearing, the District Court found the evidence admissible. At trial, a government witness, utilizing the PCR technique of DNA analysis, testified that the PCR analysis indicated that the DNA profile of the hair found in the mask matched that of the hair of Oliver Beasley. Beasley contends that PCR testing does not meet the standards of admissibility established by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and that even if PCR testing did meet those standards, the protocol and procedures at the Minnesota Bureau of Criminal Apprehension Forensic Science Laboratory (BCA Lab) were not adequate.

■ The standard of review for a trial court's decisions regarding the admissibility of evidence, including DNA evidence, is abuse of discretion. *See United States v. Johnson*, 56 F.3d 947, 952 (8th Cir.1995). This Court has already taken judicial notice of the reliability of the general theory and techniques of DNA profiling, and specifically the use of the restriction fragment length polymorphism (RFLP) procedure. *See United States v. Martinez*, 3 F.3d 1191, 1197 (8th Cir.1993) (citing *United States v. Jakobetz*, 955 F.2d 786, 799–800 (2d Cir.), *cert. denied*, 506 U.S. 834, 113 S.Ct. 104, 121 L.Ed.2d 63 (1992)), *cert. denied*, 510 U.S. 1062, 114 S.Ct. 734, 126 L.Ed.2d 697 (1994).[3] The PCR method, however, has not previously been reviewed by this Court. Thus, the District Court appropriately held an evidentiary hearing under standards announced in *Daubert* to determine whether the PCR method is reliable and whether the proffered DNA evidence would be admitted. *See id.*

At the *Daubert* hearing, which consumed more than three days, the District Court heard expert witnesses for both the government and the defense and received numerous exhibits. Based on the evidence adduced at the hearing, the court, having considered defendant's objections to the government's proffered DNA evidence, found the evidence admissible. In its written order, the court carefully set forth its particularized findings regarding the PCR method of DNA typing. These findings provide a concise summary of this method of DNA testing, and we quote them in full, omitting only the District Court's footnotes.

The PCR method is based upon the natural DNA replication process. By utilizing the PCR method, one can produce a substantial number of specific segments of human DNA which can then be typed. Because 99 percent of the DNA molecule is the same for every individual, the DNA segments amplified for purposes of PCR DNA typing are ones which exhibit genetic variation within the population. These variations provide the basis for DNA typing.

The PCR method recognizes that the base pairs along the DNA molecule are joined by hydrogen bonds which can be broken by heating. When exposed to heating, the two complementary strands of DNA separate or "denature." Because the bases on a DNA strand are always complementary, a denatured DNA strand forms a template that allows the manufacture of a new strand that is identical to the former complementary strand. This denatured strand is then exposed to two synthetic primers, each complementing a sequence at one end of the target sequence and which bind with their complementary sequences on the separated strands. One of a type of enzymes called polymerase can be used to attach a free nucleotides [sic] to the end of the primer. Because the nitrogenous bases of nucleotide pairs are al-

---

**3.** The opinions in *Martinez* and *Jakobetz* do not mention the specific techniques of which judicial notice was taken; however, the forensic scientists in both cases used RFLP analysis. *See Martinez*, 3 F.3d at 1193; *Jakobetz*, 955 F.2d at 798.

The RFLP procedure measures size variations in DNA sequences to distinguish one individual's DNA from that of another. *See generally Jakobetz*, 955 F.2d at 791–93 (scientific background of DNA profiling).

ways complementary, the nucleotide that is added to the end of the primer is necessarily complementary to the nucleotide on the sample DNA strand bound to the primer. Polymerase then adds another nucleotide to the nucleotide that has just been added. The second nucleotide is necessarily complementary to the next nucleotide on the sample strand. Repeated additions of free nucleotides continue until a new strand of the targeted DNA-sequence is created. The new strand is complementary to the sample strand, and thus identical to the other denatured strand of the original DNA sample.

The replication process can be repeated by reheating the sample to again cause denaturation and with each new cycle, the DNA replicated grows exponentially. Eventually, the amplification produces a sufficient quantity of a relatively pure sample for an investigator to determine the gene type of the sample. In the forensic setting, one DNA sequence or locus commonly examined after PCR amplification is the human leukocyte antigen (HLA) protein system and, in particular, the DQα gene. Other additional DNA loci which are tested using the Polymarker test kit include the following: low density lipoprotein (LDLR), glycophorin (Delta) (GYPA), hemoglobin G gamma globin (HBGG), D7S8 and group-specific component (Gc). By performing the DQα test and the Polymarker test on a DNA sample recovered from a crime scene, a DNA profile is determined.

The second phase of the PCR method of DNA typing involves comparing the DNA profile from the unknown source with the DNA profile of a known source from a possible suspect. If the profiles are different the suspect is excluded. However, if the profiles match a question is raised as to the frequency with which such a profile occurs in the population. Based upon a population database developed by the BCA, the frequency with which an individual allele occurs in the comparison population is determined. These individual probabilities are then multiplied to produce a frequency of the DNA profile in the comparison population.

Order denying defendant's motion to exclude PCR DNA evidence at 5–7. Having made the foregoing findings, the District Court then proceeded to its analysis under the *Daubert* standard.

■■■ *Daubert* provides a framework for determining whether expert scientific evidence is admissible at trial. A trial court confronted with a proffer of expert testimony must at the outset, pursuant to Federal Rules of Evidence 104(a) and 702, determine whether the expert is proposing to testify about "(1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert*, 509 U.S. at 592, 113 S.Ct. at 2796. "[T]he trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Id.* at 589, 113 S.Ct. at 2795. To assist trial courts in their task of assessing the reliability of novel scientific evidence, *Daubert* provides a list of nonexclusive factors to be considered. These factors are: (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) whether the technique is generally accepted. *See id.* at 593–94, 113 S.Ct. at 2796–97.

The District Court carefully considered the *Daubert* factors in its assessment of the reliability of the PCR method of DNA typing. Based on a thorough analysis of the evidence, the court found that (1) the PCR method of DNA typing using the DQα Amplitype test kit and the Polymarker test kit (the test kits used in this case by the BCA Lab) has been tested and is reliable; (2) the PCR method and the forensic uses of this method have been subjected to peer review; (3) the PCR method of DNA typing using the DQα Amplitype test kit and the Polymarker test kit has achieved general acceptance within the forensic science community.

Concerning the rate-of-error factor, the court found that the BCA Lab follows a protocol that conforms to guidelines that are accepted by the members of the forensic science community, that the BCA Lab is accredited to do PCR DNA testing, and that

the BCA Lab employs controls, *e.g.*, testing for contamination and double-reading test results. As to defendant's objections to the PCR method based on the potential for contamination of the DNA that is being tested, the court found that defendant's attack on the adequacy of the protocol and the practices of the BCA Lab would go to the weight of the DNA evidence and not to its admissibility. Similarly, the court rejected defendant's objection to the statistical significance of a match between the evidence samples. Defendant's objection concerned the existence of population substructures that should be accounted for; however, based on the evidence, the court found that the standard product rule used in this case to calculate the statistical probability of the match is sufficient.

Having found that the proffered DNA evidence satisfied the *Daubert* requirement of reliability, the District Court further found that it also satisfied the requirement of relevance to an issue in the case, *i.e.*, the factual issue of whether Oliver Beasley was the person in the "old man" mask who participated in the robbery of the TCF Bank. Additionally, the court, applying Rule 403 of the Federal Rules of Evidence, determined that the probative value of the evidence outweighed any concerns about its potential for unfair prejudice or confusion. The court therefore denied Oliver Beasley's motion to exclude the proffered DNA evidence.

In this appeal, Oliver Beasley reasserts his claim that PCR testing does not meet the *Daubert* standard of reliability. He fails, however, to support this claim with any fact-based arguments designed to convince us

that any of the District Court's findings concerning the reliability of PCR testing are clearly erroneous. Moreover, he does not contend (nor could he plausibly do so) that the District Court failed to follow the method that *Daubert* prescribes for the judicial assessment of the admissibility of scientific evidence. Instead, in his brief he merely incorporates by reference the arguments found in his trial counsel's memorandum in support of the motion to exclude the government's DNA evidence. We reject these arguments. First, they are not properly before us; a litigant cannot make arguments on appeal by incorporating by reference into his appellate brief arguments made in written submissions to the trial court. *See* 8th Cir. R. 28A(j); *Sidebottom v. Delo*, 46 F.3d 744, 750 n. 3 (8th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 144, 133 L.Ed.2d 90 (1995). Second, even if these arguments were properly before us, they are not geared to the standard of review, the clear-error standard, that governs our consideration of alleged errors in the trial court's fact-finding. *See* Fed.R.Civ.P. 52(a); *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–75, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985). These arguments thus would be of no assistance to Beasley in persuading us that the District Court's reliability finding regarding the science of PCR testing is clearly erroneous. Although we appear to be the first federal court of appeals to examine the PCR method of DNA typing, we note that a number of state appellate courts have examined the PCR method, and the vast majority of them have sustained the admission of DNA evidence derived from the PCR method.[4] We now join their ranks.

---

4. *See Seritt v. State*, 647 So.2d 1, 4–5 (Ala.Crim. App.1994), *cert. denied* (Ala. Aug. 12, 1994); *Harmon v. State*, 908 P.2d 434, 442 (Alaska.Ct.App.1995); *State v. Bogan*, 183 Ariz. 506, 905 P.2d 515, 520 (App.1995), *review denied as improvidently granted*, 186 Ariz. 198, 920 P.2d 320 (1996); *People v. Morganti*, 43 Cal.App.4th 643, 50 Cal.Rptr.2d 837, 849–53 (1996), *review denied* (Cal. May 22, 1996); *Redding v. State*, 219 Ga.App. 182, 464 S.E.2d 824, 827–28 (1995); *State v. Hill*, 257 Kan. 774, 895 P.2d 1238, 1247 (1995); *State v. Spencer*, 663 So.2d 271, 275 (La.Ct.App.1995); *People v. Lee*, 212 Mich.App. 228, 537 N.W.2d 233, 257–58 (1995), *appeal denied*, —— Mich. ——, 554 N.W.2d 12 (1996); *State v. Hoff*, 904 S.W.2d 56, 59 (Mo.Ct.App. 1995), *transfer denied* (Mo. Sept. 19, 1995); *State*

*v. Moore*, 268 Mont. 20, 885 P.2d 457, 474–75 (1994), *overruled on other grounds by State v. Gollehon*, 274 Mont. 116, 906 P.2d 697, 701 (1995); *People v. Morales*, —— A.D.2d ——, 643 N.Y.S.2d 217, 218–19 (1996); *State v. Lyons*, 324 Or. 256, 924 P.2d 802, 816 (1996); *State v. Moeller*, 548 N.W.2d 465, 483 (S.D.1996); *Campbell v. State*, 910 S.W.2d 475, 479 (Tex.Crim.App. 1995) (en banc), *cert. denied*, —— U.S. ——, 116 S.Ct. 1430, 134 L.Ed.2d 552 (1996); *Spencer v. Commonwealth*, 240 Va. 78, 393 S.E.2d 609, 621, *cert. denied*, 498 U.S. 908, 111 S.Ct. 281, 112 L.Ed.2d 235 (1990); *State v. Gentry*, 125 Wash.2d 570, 888 P.2d 1105, 1117–18 (en banc), *cert. denied*, —— U.S. ——, 116 S.Ct. 131, 133 L.Ed.2d 79 (1995); *cf. Williams v. State*, 342 Md.

Beasley's main attack upon the District Court's denial of his motion to exclude the DNA evidence is that PCR testing requires special precautions that the BCA Lab did not observe: (1) frequent external proficiency testing of personnel who perform DNA testing; (2) double blind external tests to check results and to show that proper procedures are being followed; and (3) maintaining records of errors in PCR testing. We agree with the District Court that these alleged deficiencies (which the government vigorously disputes) go to the weight of the DNA evidence, not to its admissibility. *See Johnson*, 56 F.3d at 953 (holding testimony that proper protocol was not followed in conducting DNA analysis went to the weight rather than to the admissibility of the evidence). As we said in *Martinez*, 3 F.3d at 1198, "[A]n allegation of failure to properly apply a scientific principle should provide the basis for exclusion of an expert opinion only if 'a reliable methodology was so altered ... as to skew the methodology itself ....'" (quoting *In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 858 (3d Cir.1990), *cert. denied*, 499 U.S. 961, 111 S.Ct. 1584, 113 L.Ed.2d 649 (1991)). Beasley's arguments fail to show that the BCA Lab's alleged deficiencies so altered the PCR methodology as to make the test results inadmissible.

Having considered all of Beasley's arguments, we conclude that the District Court did not abuse its discretion in admitting the government's evidence showing a "match" between the DNA in the hairs found in the rubber mask and Beasley's DNA. Moreover, we believe that the reliability of the PCR method of DNA analysis is sufficiently well established to permit the courts of this circuit to take judicial notice of it in future cases. In every case, of course, the reliability of the proffered test results may be challenged by showing that a scientifically sound methodology has been undercut by sloppy handling of the samples, failure to properly train those performing the testing, failure to follow the appropriate protocols, and the like.

## B.

Oliver Beasley also contends that the District Court erred in denying his motion to sever. A district court's refusal to grant a motion for severance will be reversed only for abuse of discretion resulting in clear prejudice to the defendant. *See United States v. Bordeaux*, 84 F.3d 1544, 1547 (8th Cir.1996). Where codefendants are charged with the same crimes, including conspiracy, and the crimes of the codefendants will be proved by the same evidence, joint trials are generally favored. *See United States v. Williams*, 95 F.3d 723, 732 (8th Cir.1996). Having considered all of Beasley's arguments, we find no abuse of discretion in the court's refusal to sever. This case is such that the jury could compartmentalize the evidence against each of the defendants, *see United States v. Foote*, 920 F.2d 1395, 1398 (8th Cir.1990), *cert. denied*, 500 U.S. 946, 111 S.Ct. 2246, 114 L.Ed.2d 487 (1991), and Oliver Beasley has not shown any prejudice, much less clear prejudice, from his joinder with Reginald Beasley, *see United States v. Mason*, 982 F.2d 325, 328 (8th Cir.1993) (to establish prejudice, "defendant must show an appreciable chance that he would not have been convicted had separate trials been granted").

## C.

Finally, Oliver Beasley argues that the District Court erred by not granting Beasley's motion for a mistrial after the District Court inadvertently read to the jury during final instructions his prior felony convictions. This occurred when the court read the portion of the indictment charging that Oliver Beasley was a felon in possession of a firearm. The parties had stipulated to the fact of a prior felony, and the court had agreed not to mention the number and nature of Oliver Beasley's prior felonies. Upon denying Beasley's motion for a mistrial, the District Court instructed the jury to disregard the number and nature of Oliver Beas-

724, 679 A.2d 1106, 1121 (1996) (because defendant's convictions were reversed on other grounds, court did not need to decide the admissibility of PCR DNA evidence). *But see State v.*

*Carter*, 246 Neb. 953, 524 N.W.2d 763, 780–83 (1994) (statistical probability calculation used in PCR DNA analysis is not generally accepted within the scientific community).

ley's prior felonies, and instead to be guided by the instructions given by the court. Trial Transcript Vol. X at 200–01. The grant or denial of a motion for a mistrial may be reversed only upon a showing of an abuse of discretion. *See United States v. Boykins,* 966 F.2d 1240, 1244 (8th Cir.1992). Given the court's curative instruction and the strength of the government's case against Oliver Beasley, the District Court did not abuse its discretion in denying the motion for a mistrial.

## IV.

Oliver Beasley and Reginald Beasley each raise several identical issues.

### A.

■ First, defendants contend that the trial court erred in admitting into evidence a letter to Shenethia Davis from the government stating that she was not entitled to any benefit as a result of her testimony in this case. Defendants argue that this letter is hearsay and improperly bolsters Davis's testimony.

The letter from the Department of Justice to Davis was introduced into evidence during the government's redirect examination of Davis. On the cross-examination of Davis, counsel for each defendant questioned Davis as to whether she expected some benefit in her then-pending armed robbery case in East St. Louis, Illinois, in exchange for her testimony in this case. This line of questioning could have left an impression with the jury that the witness was to receive some leniency in her armed robbery case as a result of her testimony in this case. To counter this impression, the government offered and the court received into evidence a letter dated May 30, 1995 to Davis from the office of the United States Attorney for the District of Minnesota, signed by Assistant United States Attorney Michael Ward, co-counsel for the government in this case. The letter was read into evidence. It states that "no promises of leniency or other benefits have been made" by anyone in the United States Attorney's office or by the state prosecutor's office in East St. Louis.

The letter was introduced into evidence to refute the defendants' allegations that the testimony of Davis was tainted because she expected to receive some personal benefit as a result of her testimony in this case. It seems to us that the correct way to refute this attack on Davis's credibility would have been through testimony by a representative of the United States Attorney's office who had personal knowledge whether Davis had been promised a benefit in exchange for her testimony. *See United States v. Kenney,* 911 F.2d 315, 319 (9th Cir.1990); *United States v. Roberts,* 676 F.2d 1185, 1187 (8th Cir.) (when defense suggested that a witness implicated the defendant only because of the witness's plea agreement with the government, testimony of Drug Enforcement Administration agent to refute this allegation was not hearsay), *cert. denied,* 459 U.S. 855, 103 S.Ct. 122, 74 L.Ed.2d 106 (1982). But even if this letter was inadmissible hearsay, as we are inclined to think it was, given the overwhelming evidence of defendants' guilt, the letter's admission into evidence was, at most, harmless error. *See United States v. DeAngelo,* 13 F.3d 1228, 1233 (8th Cir.) (harmless error in admitting tape recording into evidence where record contained overwhelming evidence of defendant's guilt), *cert. denied,* —— U.S. ——, 114 S.Ct. 2717, 129 L.Ed.2d 842 (1994).

■ Furthermore, defendants contend that admitting the letter into evidence constituted improper bolstering or vouching for Davis's credibility. A prosecutor may not place the prestige of the government behind a witness. *United States v. Tate,* 915 F.2d 400, 401 (8th Cir.1990). Such improper vouching occurs when the government indicates that it may know something about the veracity of a witness that the jury does not or that the government has independently verified a witness's testimony. *United States v. Magee,* 19 F.3d 417, 421 (8th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 343, 130 L.Ed.2d 299 (1994). Impermissible vouching may also occur when the government implies a guarantee of a witness's truthfulness, refers to facts outside the record, or expresses a personal opinion as to a witness's credibility. *See id.*

■ There was no impermissible vouching in this case. Simply introducing into evidence a letter indicating the absence of any promised benefits by the government is not vouching. *See Kenney,* 911 F.2d at 319–20 (testimony of government attorney regarding, among other things, the absence of an immunity agreement was not improper vouching). Evidence of the existence, the terms, and the witness's understanding of a plea or witness immunity agreement is not vouching. *See Jenner v. Class,* 79 F.3d 736, 739 (8th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 194, 136 L.Ed.2d 131 (1996); *Magee,* 19 F.3d at 421; *Tate,* 915 F.2d at 401. Similarly, evidence of the absence of any comparable arrangement between a witness and the government is not impermissible vouching when a defendant has implied that such an arrangement exists. The government did not vouch for Davis's credibility. In fact, the government did not comment in any way on Davis's veracity.

### B.

■ Defendants also contend that prior consistent statements of Davis were improperly admitted into evidence. At trial, Davis testified that she saw the defendants on September 19, 1994, at which time the defendants indicated their intent to go to Minnesota, and that the defendants returned to East St. Louis on September 23, 1994 (one day after the robbery of First Bank) with $4,000 in cash. During Davis's cross-examination, the defendants questioned her about specific dates concerning the defendants' travel to Minnesota allegedly provided by Davis during interviews with the FBI. These dates allegedly given by Davis to the FBI would tend to support the defendants' contention that they were not in Minnesota at the time of the First Bank robbery.

In response to this cross-examination of Davis, the government called to the stand FBI Special Agent Tyrone Fortay, who had conducted the interviews with Davis. Fortay testified that during these interviews Davis did not provide specific dates for defendants' travel to and from Minneapolis. On the contrary, Fortay testified that he came up with the dates based on inferences he drew from the information provided by Davis. He also recounted what Davis did say during the interviews.

Federal Rule of Evidence 801(d)(1)(B) excludes from the definition of hearsay a prior statement of a declarant who testifies at trial and is subject to cross-examination concerning the prior statement when the statement is "consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper motive." We need not prolong this opinion by discussing the "fit" between Fortay's testimony and Rule 801(d)(1)(B), for in any event the admission of his testimony as to Davis's prior consistent statements was harmless error at most. The crux of Fortay's testimony was that Davis did not provide the FBI with specific dates. This portion of Fortay's testimony is not hearsay within the definition of Federal Rule of Evidence 801(a) as it did not recount an out-of-court statement. *See United States v. Provost,* 875 F.2d 172, 176 (8th Cir.) (witness's statement that victim's "actual story never varied" was not hearsay as defined by Rule 801(a)), *cert. denied,* 493 U.S. 859, 110 S.Ct. 170, 107 L.Ed.2d 127 (1989). Furthermore, even if the balance of Fortay's testimony was inadmissible (a point we need not and do not decide), its admission added nothing of substance to the government's evidence, which established the guilt of both defendants beyond a reasonable doubt. *See United States v. Bowman,* 798 F.2d 333, 338–39 (8th Cir.1986) (no prejudicial error is shown where the prior statements themselves provided nothing substantively new to the testimony of the government witnesses, and even excluding the prior consistent statements the record established the defendant's guilt beyond a reasonable doubt), *cert. denied,* 479 U.S. 1043, 107 S.Ct. 906, 93 L.Ed.2d 856 (1987).

### C.

■ Both defendants also contest the admission into evidence of the two knit masks found in the elevator pit of Oliver Beasley's apartment building. Defendants argue that the masks should not have been admitted into evidence because there was no positive

identification of the masks as those used in the First Bank robbery. They also argue that the questions asked by the government concerning the masks led to an improper inference that Reginald Beasley was involved in an unrelated armed robbery in East St. Louis. Before trial, defendants filed a motion in limine to exclude evidence of an East St. Louis convenience store robbery by Reginald Beasley. Defendants' motion was granted and the government was prohibited from introducing evidence of this unrelated robbery; however, the government was permitted to introduce evidence concerning two masks used in the unrelated robbery. The jury heard from Tracy Wilson, who, after testifying that he had been charged with armed robbery, told about the night in Belleville, Illinois, at Davis's home when he saw the masks. Wilson testified that Reginald Beasley took two skull caps out of a bag in Davis's closet. Reginald Beasley put on the black skull cap, which had holes for eyes already cut out. Reginald Beasley gave the blue skull cap to Wilson, who had Davis cut holes in it for his eyes. Wilson testified that thirty minutes later both masks were in Reginald Beasley's possession. Finally, Wilson identified in court the two knit masks found in the elevator pit of Oliver Beasley's apartment building as similar to the ones he and Reginald Beasley had that night in Belleville.

In their arguments concerning the inadmissibility of the knit masks, the appellants refer to Federal Rule of Evidence 404(b); this reference is inappropriate because the evidence concerning the masks did not amount to evidence of "other crimes, wrongs, or acts." *See* Fed.R.Evid. 404(b). Instead, the masks were relevant and admissible evidence of the defendants' commission of the crimes charged in the indictment. *See United States v. Aranda*, 963 F.2d 211, 214 (8th Cir.1992) ("Evidence that is probative of the crime charged does not fall within the ambit of Rule 404(b)."). Contrary to defendants' argument, the background information provided by Wilson as to where and when he came into contact with the masks did not implicate Rule 404(b). This information was necessary to establish that his in-court identification of the masks used in the First Bank robbery was based on a rational perception.

*See* Fed.R.Evid. 701; *Wactor v. Spartan Transp. Corp.*, 27 F.3d 347, 350–51 (8th Cir. 1994) (to conclude that lay opinion testimony is admissible, a court must find that the testimony is based upon personal observation and recollection of concrete facts). The admission of this evidence did not violate the trial court's ruling granting the defendants' motion in limine, and its admission was not an abuse of discretion. Defendants' contentions relating to the nonunique nature of the masks and the absence of positive identification of the masks as those used in the First Bank robbery go to the weight of the evidence, not to its admissibility. *See, e.g., United States v. Page*, 544 F.2d 982, 987 (8th Cir.1976) ("[A]n attack upon the probative sufficiency of evidence relates not to admissibility but to the weight of the evidence and is a matter for the trier of fact to resolve.").

#### D.

█ Defendants argue that the evidence is insufficient to support their convictions for the First Bank robbery. "In reviewing the sufficiency of the evidence, we view the evidence in the light most favorable to the government, resolving evidentiary conflicts in favor of the government, and accepting all reasonable inferences drawn from the evidence that support the jury's verdict." *United States v. White*, 81 F.3d 80, 82 (8th Cir. 1996). We will uphold the jury's verdict "if there is an interpretation of the evidence that would allow a reasonable-minded jury to find the defendant guilty beyond a reasonable doubt." *Id.* at 82.

Having reviewed the record with the foregoing principles in mind, we find there was sufficient evidence to support the challenged convictions. Our conclusion rests on: (1) the testimony of Davis placing the defendants in Minnesota at the time of the robbery and in possession of $4,000 in cash upon their return to East St. Louis; (2) the proximity of Oliver Beasley's apartment to both First Bank and the location where the car used in the robbery was stolen earlier that day; (3) the discovery of the getaway vehicle next to Oliver Beasley's apartment building immediately after the robbery; (4) the discovery in the elevator shaft next to Oliver Beasley's apart-

ment of sunglasses belonging to the owner of the stolen getaway car, a black and a blue ski mask identical to masks used in the First Bank robbery and identical to masks seen earlier in the possession of Reginald Beasley, ammunition of the type used in the later robbery of TCF Bank, and two dark gloves similar to those used in the First Bank robbery; and (5) the evidence pertaining to the two guns that were recovered after the TCF Bank robbery and that were depicted on surveillance photographs made during the First Bank robbery.

One of defendants' chief arguments goes to the credibility of their alibi witnesses versus that of Davis. Credibility assessments are a matter for jury determination. *See United States v. Smith,* 91 F.3d 1199, 1200–01 (8th Cir.1996). Because a reasonable jury could have found that Davis's testimony was more credible than that of defendants' alibi witnesses, we will not disturb the jury's verdict. *See id.* at 1201.

### E.

■■■ Defendants next contend that the District Court committed plain error when the court instructed the jury that 18 U.S.C. § 924(c)(1)'s phrase "uses or carries a firearm" includes "having a firearm, or firearms, available to assist or aid in the commission of the crime" and that "[t]he government is not required to show that the defendant actually displayed or fired the weapon." Trial Transcript Vol. X at 181–82. This instruction, which was proper under the law of our circuit at the time it was given, is improper as to the "use" prong of the statute in light of the Supreme Court's intervening decision in *Bailey v. United States,* —— U.S. ——, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995). For there to be a proper "use" conviction under § 924(c)(1), *Bailey* requires "active employment of the firearm." *Id.* at ——, 116 S.Ct. at 506. This includes "brandishing, displaying, bartering, striking with, and most obviously, firing or attempting to fire, a firearm." *Id.* at ——, 116 S.Ct. at 508.

■■■ Because no objection was made at the trial concerning the § 924(c)(1) instruction, we review for plain error. *See* Fed. R.Crim.P. 52(b); *United States v. Willis,* 89 F.3d 1371, 1379 n. 4 (8th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 273, 136 L.Ed.2d 196 (1996). Initially, we must determine whether the trial court's error was plain and whether it affected the defendants' substantial rights. *See United States v. Herron,* 97 F.3d 234, 238 (8th Cir.1996). "Even if those conditions are met, we exercise our discretion to reverse only where the error 'seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings.'" *Id.* (quoting *United States v. Olano,* 507 U.S. 725, 736, 113 S.Ct. 1770, 1779, 123 L.Ed.2d 508 (1993)) (alteration in *Herron*).

■■■ The government essentially concedes that the District Court's error in instructing the jury regarding § 924(c)(1) was "plain"—clear under the law at the time of this appeal, *see United States v. Caldwell,* 97 F.3d 1063, 1069 (8th Cir.1996). The government does not concede, however, that the error affected defendants' substantial rights. Defendants' substantial rights are affected if the error prejudicially influenced the outcome of the district court proceedings. *See Olano,* 507 U.S. at 734–35, 113 S.Ct. at 1777–78; *United States v. Webster,* 84 F.3d 1056, 1066 (8th Cir.1996). The record clearly shows that in committing the two bank robberies defendants actively employed their weapons. There is evidence, in the form of surveillance photographs and testimony, that one of the defendants stuck his gun in the face of tellers at both banks and that the other defendant placed his shotgun in the back of a teller at one bank and pointed it at a teller in the other bank. Furthermore, as defendants fled TCF Bank, both completely emptied their firearms while shooting at the pursuing police officers. Beyond a reasonable doubt, both defendants "used" their weapons within the meaning of § 924(c)(1) as explicated in *Bailey.* Because a proper jury instruction would not have altered the jury's conclusion, defendants' substantial rights were not affected by the erroneous instruction.[5] *See Willis,* 89 F.3d at 1379 n. 4. Thus,

---

5. As a result, we need not consider whether the erroneous instruction would warrant an exercise of our discretion to reverse under the plain error standard.

defendants cannot satisfy the plain error standard, and their § 924(c)(1) convictions must stand.

### F.

 Defendants argue in a broad, non-specific way, that the District Court erred in not exercising its supervisory authority over the government's charging decisions. Because defendants offer us no legal theory, argument, or authority to support their assertion, we can conclude only that the assertion lacks merit. In any event, we note that charging decisions rest within the broad discretion of the prosecution. *See Wayte v. United States*, 470 U.S. 598, 607–08, 105 S.Ct. 1524, 1530–31, 84 L.Ed.2d 547 (1985).

### V.

The convictions of each of the defendants are affirmed.