## A95A1829. REDDING v. THE STATE.
(464 SE2d 824)

ANDREWS, Judge.

Redding appeals from a judgment entered on a jury verdict finding him guilty on 13 of 14 counts of rape, aggravated sodomy, aggravated assault, burglary, robbery, armed robbery and possession of a knife. This is the third appearance of this case in our court, and the procedural history is an involved one. Redding was first indicted in 1988 for the rape and robbery of C. W. on September 29, 1987. Redding filed a motion to suppress evidence obtained in that case, and the trial court denied it. Redding appealed, and we remanded the case to the trial court to review certain misstatements and omissions in the affidavit submitted to obtain the search warrant. *Redding v. State*, 192 Ga. App. 87 (383 SE2d 640) (1989). On remand, the trial court granted the motion to suppress. Redding was then re-indicted for the offenses involving C. W. and for additional offenses occurring during the rape of H. B. Redding's trial in August 1991 on the H. B. counts ended in a mistrial. Redding was indicted a third time for these same offenses and filed a motion for judgment of acquittal based on OCGA § 17-7-53.1. The trial court denied the motion, and we affirmed. *Redding v. State*, 205 Ga. App. 613 (423 SE2d 10) (1992). In March 1994, the trial court affirmed its earlier ruling that the DNA evidence in the H. B. case was admissible and ruled some of the new DNA evidence in the C. W. case admissible and some not admissible.

Redding was convicted, and the trial court sentenced him to five life sentences plus forty years. Redding now appeals the trial court's denial of his motion for new trial.

1. In his first enumeration of error, Redding contends that the trial court erred in denying his *Batson* challenge to the striking of a black juror. Redding argues that the State's explanation for striking the juror, that the juror was unemployed, is not a sufficient reason under *Batson*. However, the State gave several race-neutral reasons for striking the juror. The juror's sister had been charged with felony assault offenses. Another sister had just left the DeKalb Police Department under circumstances which suggested there may have been bad feelings. Further, the juror was friends with another juror who had been charged with child molestation and sexual assault and was struck for cause because he was a convicted felon.

Thus, we find that the prosecutor gave sufficient race-neutral reasons for striking this juror to warrant the trial court's denial of Redding's *Batson* challenge. Accordingly, this enumeration of error is without merit.

2. Second, Redding argues that the evidence fails to support the verdict. On appeal, this Court determines the sufficiency and not the

weight of the evidence. *Lattimore v. State,* 203 Ga. App. 259, 260 (416 SE2d 829) (1992). Further, the evidence must be viewed in the light most favorable to the jury's verdict, and Redding no longer enjoys a presumption of innocence. *Palmore v. State,* 213 Ga. App. 140, 141 (444 SE2d 581) (1994). Accordingly, the evidence at trial was as follows. Around 7:00 a.m. on August 4, 1987, just as it was getting light, H. B. awoke to find a black male with a knife hovering over her. She was able to see him for approximately ten seconds and then he told her to close her eyes and keep them closed. H. B.'s two-year-old daughter and five-month-old son were also in the room with her. The man forced her to orally sodomize him and raped her. H. B. testified that the man smelled of beer. After he raped her, the man demanded money. H. B. described her attacker as being between five feet, eight inches and five feet, ten inches tall, weighing 135 to 150 pounds, with a moustache and thin short hair, wearing a red t-shirt with black writing on it and having a large amount of body hair.

On September 29, 1987, C. W., who lived two-tenths of a mile from H. B., was awakened in the early morning by someone taking her cover off and kicking her ankle. C. W. jumped out of bed, and the man put his arms out to keep her from running out of the room. C. W. testified that the man smelled of beer. She decided to fight and hit her attacker in the groin. The man beat her until she stopped struggling. He repeatedly forced her to orally sodomize him and raped her several times. After the rape, the man demanded money and left after pulling her phone out of its socket and taking the money in her purse.

H. B. gave police information as to the general description of her attacker but told them she would not be able to identify him because she had not seen him clearly enough. C. W. stated that she thought she would be able to identify her attacker. She gave police information for a composite sketch, and the detectives from the Decatur Police Department thought the composite resembled Redding. In addition, C. W. described her attacker as having a scar, and Detective Rosser discovered that Redding had a scar on the left side of his stomach and a scar down the middle of his stomach. Further, Redding lived in the same neighborhood as C. W. and H. B., approximately four-tenths of a mile from C. W.

When C. W. was driving through the neighborhood with detectives in an attempt to identify her attacker, the detectives spotted Redding at a convenience store. They called Redding over to the car. C. W. told the detectives that Redding was not the man who attacked her, but she got scared when she heard his voice. She told the detectives that Redding's head and body were the exact shape as the rapist's.

The forensic evidence introduced at trial showed that hair

matching that of Redding's was found in the pubic combings of the two victims and on the bed sheets. There was expert testimony that the DNA isolated from the H. B. rape kit matched the DNA isolated from Redding's blood. There was also expert testimony as to the DNA match between Redding's blood and the sperm found on C. W.'s sheet and in C. W.'s rape kit. Further, Redding matched the physical description given by both victims. In addition, Redding had a scar similar to the one C. W. described to police.

Accordingly, for the reasons discussed above, we find that the evidence was sufficient to authorize a rational trier of fact to find Redding guilty beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

3. Redding also appeals the trial court's denial of his motion to sever the H. B. case from the C. W. case. The facts in the two cases, as discussed above, are so similar that even if the two cases had been severed, each would have been admissible in the other case as evidence of a similar transaction. See *Byars v. State*, 198 Ga. App. 793, 794 (403 SE2d 82) (1991) (rule allowing similar transaction evidence has been liberally extended in sexual offense cases). Accordingly, "[w]here the evidence of one crime would be admissible in the trial of the other crime, it cannot be said that the trial court abused its discretion in denying (the) motion for severance." (Citation omitted.) *Weaver v. State*, 206 Ga. App. 560, 561 (426 SE2d 41) (1992). Therefore, the trial court did not err in denying the motion to sever.

4. Redding claims that evidence of DNA matching was improperly admitted. Specifically, Redding objects to: 1) the evidence allowing the use of a monomorphic enzyme probe to correct for band shifting, thus allowing the State's witness to testify that there was a match of otherwise non-matching DNA; 2) the admission of improper statistical procedures and 3) the admission of the results of the DNA matching tests because improper execution of laboratory techniques and human error caused these results to be unreliable.

In this case, two different laboratories conducted the testing of the DNA evidence admitted. Lifecodes performed the RFLP (restriction fragment length polymorphism) test of the evidence gathered in the H. B. case, and Genetic Design performed the PCR (polymerase chain reaction) tests in both the C. W. and H. B. cases. Redding complains of the correction for band shifting which occurred in the RFLP test and argues that the PCR technique is not acceptable.

The trial court conducted extensive hearings and listened to testimony from numerous expert witnesses on the issues of admissibility of the DNA evidence, and the court's order on these issues is thorough and well reasoned. We agree with the trial court that the procedures used in the testing were sufficiently reliable to admit the DNA evidence. Dr. Choi, who testified as an expert for the defense, stated

that while he disagreed with Lifecodes' interpretation of the results, the manner in which Lifecodes tested the DNA evidence was acceptable. Dr. Adkinson admitted that the manner in which the DNA was collected was proper. The trial court found there was "no dispute over the correctness of the procedures used by Lifecodes in conducting the RFLP analysis. The only dispute involves the question of whether a laboratory should correct for band shift." There was also no testimony faulting the procedures used by Genetic Design with regard to the HLA-DQALPHA and D1S80 testing. In addition, we need not consider complaints about the handling of the evidence used in the PCR tests conducted by Lifecodes since the trial court determined this evidence was not admissible.

Further, the statistical procedures used were proper. Dr. McElfresh testified that the calculations performed in the H. B. case were based upon *actual* observed genotype frequencies as opposed to *expected* frequencies. These observed frequencies are more conservative or favorable to the defendant than the expected frequency calculations using the Hardy-Weinberg formula. Dr. Anderson, a defense witness, testified that Lifecodes' method of calculating frequencies was proper.

With regard to the issue of whether evidence obtained as a result of band shifting should have been admitted, the Georgia Supreme Court has ruled that evidence obtained as a result of Lifecodes' use of a monomorphic probe to correct for band shifting is admissible. *Caldwell v. State*, 260 Ga. 278, 287-288 (393 SE2d 436) (1990).

Redding also contends that the use of the PCR technique is not acceptable since it requires a "trust me" approach to verification. The lightness or darkness of the "dot" test results does not always show up on a photograph used to verify the tests. As the trial court explained in its order, the PCR technique is an amplification process which causes the DNA to separate and replicate. This results in a larger pool of DNA than that obtained from the original sample. The trial court also noted that the use of PCR has many advantages, among which are its ability to be used on old and degraded samples and also on smaller samples than those required for other tests. While there were possible problems which could arise in using this technique, the court noted that there was no evidence of any of these problems occurring in this particular test. Although the trial court found that the PCR tests conducted by Lifecodes were not sufficiently reliable to be admitted, the trial court did allow into evidence the PCR tests performed by Genetic Design.

Georgia has not decided the issue of the reliability of PCR testing, although other states have allowed this evidence to be introduced. See, e.g., *Spencer v. Commonwealth*, 240 Va. 78 (393 SE2d 609) (1990); *State v. Lyons*, 124 Or. App. 598 (863 P2d 1303) (1993).

We agree with the trial court's determination that the tests conducted on the DNA samples using the PCR technique were admissible. We find that the trial court's approach in determining whether the principles and techniques involved in the PCR testing were valid and whether the procedures were performed in a scientifically acceptable manner is consistent with the approach in *Harper v. State*, 249 Ga. 519, 524-526 (292 SE2d 389) (1982). See also *Caldwell*, supra at 287.

Therefore, the court did not err in admitting the results from the DNA testing into evidence. See *Johnson v. State*, 264 Ga. 456, 458 (448 SE2d 177) (1994) (admissibility of DNA evidence dependent upon court's determination that procedures were performed in an acceptable manner and were capable of producing reliable results). Accordingly, we find this enumeration of error to be without merit.

5. In his fifth enumeration of error, Redding claims that the trial court erred in denying his motion to suppress. Redding argues that the State obtained its search warrant solely on evidence gathered as a result of a prior search warrant which was found to have been issued without probable cause and the evidence obtained under it suppressed. The evidence suppressed was actually obtained under three prior search warrants. This evidence consisted of samples of Redding's blood, pubic hair, facial and head hair. On August 30, 1989, Investigator Rosser obtained a fourth search warrant for the blood, head hair, pubic hair, facial hair, body hair and saliva of Redding. The affidavit used to obtain this warrant sets out the facts of the two cases, descriptions of the attacker given by the victims, a scar on Redding's side that could match a description of the scar given by C. W. and numerous other details. The affidavit does not mention the matching of hair samples or DNA matching of the blood sample obtained under the previous warrants.

On August 2, 1993, an investigator from the district attorney's office obtained a fifth search warrant for additional blood from Redding. In the affidavit used to obtain this warrant, the investigator mentions the hair matches and DNA test results, but these are the results from tests performed using samples obtained under the fourth search warrant. Since we find that there was probable cause to issue the fourth search warrant and since it was not tainted by the evidence suppressed which was obtained under the first three search warrants, this enumeration of error is without merit. Accordingly, the trial court did not err in denying the motion to suppress.

6. Last, Redding claims he was denied his constitutional right to a speedy trial. The four factors to be used in evaluating a Sixth Amendment speedy trial claim are: 1) length of delay; 2) reason for delay; 3) defendant's assertion of his right and 4) prejudice to the defendant. *Redd v. State*, 261 Ga. 300, 301 (404 SE2d 264) (1991).

While the case did take a long time to finally resolve, many of the

delays were due to actions appropriately taken on behalf of the defendant. This case involved two trials, two interlocutory appeals and numerous motion hearings. Redding's first lawyer represented him through the first trial, which ended in a mistrial, and two interlocutory appeals. Redding was represented by different counsel at the second trial. Although Redding's second trial counsel testified that Redding asked her to file a speedy trial demand, she stated that she pointed out to him that since this was a very complex case, she would be unable to prepare in such a short time if the demand were granted. Counsel also stated that Redding told her he understood her reasons for not filing the speedy trial demand out of time. Redding's contention that a speedy trial could possibly have solved some of the problems caused by the age degradation of the DNA is of little weight given the facts that there is no evidence that the State was responsible for deliberately delaying the trial in order to hamper the defense and much of the delay was for actions taken on behalf of the defendant. Further, Redding was in prison on other charges while this trial was pending.

In addition, counsel was not ineffective for failing to file a speedy trial demand. Although Redding does not list ineffective assistance of counsel as a separate enumeration of error, he argues that counsel was ineffective in failing to file a speedy trial demand. As discussed above, neither trial counsel felt it was in the defendant's best interest to file a demand for a speedy trial since the case was so complicated and required an unusual amount of preparation time. This enumeration of error is without merit.

*Judgment affirmed. McMurray, P. J., and Blackburn, J., concur.*

DECIDED NOVEMBER 6, 1995 —
RECONSIDERATION DENIED NOVEMBER 29, 1995.

*William T. Hankins III*, for appellant.
*J. Tom Morgan, District Attorney, Barbara B. Conroy, John H. Petrey, Assistant District Attorneys*, for appellee.