## A99A1740. BLUAIN v. THE STATE.
### (529 SE2d 155)

ANDREWS, Presiding Judge.

Donnell Bluain appeals following the denial of his motion for new trial after conviction of three counts of rape, two counts of burglary, one count of aggravated sodomy, one count of attempting to commit aggravated sodomy, and one count of kidnapping with bodily injury.[1]

1. Bluain's fourth enumeration of error challenges the legal sufficiency of the evidence, and we consider it first.

> On appeal[,] the evidence must be viewed in the light most favorable to support the verdict, and [Bluain] no longer enjoys a presumption of innocence; moreover, an appellate court determines evidence sufficiency and does not weigh the evidence or determine witness credibility. . . . [T]he test established in *Jackson* [v. *Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979)] is the proper test for us to use when the sufficiency of the evidence is challenged, whether the challenge arises from the overruling of a motion for directed verdict or the overruling of a motion for new trial based upon alleged insufficiency of the evidence. [Cit.]

(Punctuation omitted.) *Carter v. State*, 235 Ga. App. 260 (1) (510 SE2d 539) (1998).

So viewed, the evidence was that, on April 14, 1992, V. Robinson was awakened in her Doraville home around 3:30 a.m. by a noise she initially believed was made by her cat. She was dressed in a knee-length T-shirt nightgown and was wearing panties and socks. She got out of bed to check and was immediately grabbed from behind by a man. He placed one hand around her neck and the other over her mouth and whispered that if she screamed he would kill her. He said he wanted money, and she told him to take what she had, which was not much because she had been on vacation. He then walked her down the hall, with his chest pressed against her back and some object, which could have been a screwdriver, pressed into her side. The man was carrying a flashlight, larger than a penlight, and used it as they went down the hallway.

Although she was unaware of it at the time, her cash had already been removed from her purse, apparently by the intruder.

---

[1] Counts 1 through 4 of the indictment involved victim V. Robinson and alleged burglary, rape, and two counts of aggravated sodomy. Counts 5 through 8 involved victim C. Robinson (no relation to V. Robinson) and alleged burglary, kidnapping with bodily injury, and two counts of rape. The jury returned a verdict of guilty of attempt to commit aggravated sodomy on Count 4.

She told him there might be some cash in a kitchen drawer, but he said she was trying to trick him. He did check the drawer, but there was no money there. He attempted to engage her in conversation, asking what she did for a living. He then said, "Since I can't have any money[,] I'm going to take something else."

Admonishing her not to look at him, he walked her into the living room and directed her to lie down and pull her gown over her face, which she did. He then placed a throw pillow over her face and took off her panties and socks. He sucked her toes and then performed oral sodomy on her. He then had intercourse with her while saying that he wanted to be with a white woman. He asked her if her roommate, asleep upstairs, would want some, and she told him that she wanted him all to herself, in order to protect her roommate. During these acts, V. Robinson was able to see the man's arm and determine that he was African-American. She asked him to use a condom which she had upstairs, but he refused, saying she was trying to trick him. He did withdraw before ejaculating after she told him she might have a sexually transmitted disease. She took him in her hand, and he ejaculated onto her stomach. She asked him to leave, but he said no, he was going to do it again and this time she "was going to take it up the ass." He then tried to enter her from the rear, and although he touched her anus, she was able to guide him into her vagina. Only one or two minutes had elapsed between the man's erections. He again withdrew and ejaculated onto her. He was wearing some type of cloth gardening glove which V. Robinson described as smelling of dirt.

She again asked if he would leave, and he directed her to stay on the floor, not to try to see him, not to call the police, and to give him two or ten minutes to get away.

V. Robinson described the man as extremely lean and very muscular with broad shoulders and approximately 5′9″ or 5′10″ tall. She believed he had a mustache and might have had a beard or five o'clock shadow.

After he left, she discovered that the window next to the front door had been inadvertently left open. She locked it after he left, wakened her roommate and called the police. As they were waiting for the police, they saw an old silver or light color Datsun drive by slowly. Later, she found the screen which had been on the front window lying outside on the ground.

V. Robinson's nightgown and vaginal swabs taken from her were sent to the Georgia Bureau of Investigation laboratory where DNA testing was conducted on them and on blood taken from Bluain after his arrest in 1996. DNA analyst Fyffe testified that, while she could not say with reasonable scientific certainty that Bluain was the donor of the semen sample removed from the nightgown, she could

say that only one in 1,000 African-American men would have the test results she obtained and that two bands on the questioned DNA did match or were consistent with Bluain's DNA and he could not be excluded as the donor.

On June 3, 1992, in east DeKalb County, C. Robinson was awakened about 2:15 a.m. by someone shining a penlight in her eyes and saying that, if she screamed, he would cut her throat. He placed his hand over her mouth and told her to get up slowly, which she did. He put his hand around her neck and told her to walk toward the living room, which she did, with him walking behind her, his chest to her back. He asked where her purse was and was told on the dining room table. He rifled through it, taking the few dollars in it. He then pushed her back toward her daughter's bedroom.[2] Hearing a car, he ordered her to face the wall, and he looked out the window. Then, he told her to lift her nightgown and lie on the bed, which she did. He directed her to pull her gown over her face and then asked if she and her boyfriend used condoms and if she wanted him to use one. She was crying, and he asked why. She begged him not to hurt her. She heard him rustling with a condom package, and he did use one that time. He told her to move, and she complied. After he ejaculated, he told her to get up but keep the gown over her face. After she complied, he grabbed her, was behind her again, and pushed her out into the living room. He told her to unlock the front door and looked outside. Then, he told her to close the door but leave it cracked, which she did.

He told her to bend over the couch and asked her if she had ever been "f----d in the ass." C. Robinson told him that if he did that, she would scream, and she begged him not to. He then had vaginal sex with her from the rear. He then made her lie face down on the couch and fondled her. Then, he told her not to move or he would kill her. After she heard the door open and felt air from it, C. Robinson got up, looked out, and saw him run into some woods. She discovered the window raised in her daughter's room, although she knew it had been down when she went to bed. The screen had been removed and was underneath the window.

C. Robinson, who was African-American, saw the man's leg at some point and described it as tan in color. She said he was very muscular, about 5'8" tall, and was wearing a stocking mask or hose over his face. She detected what she described as a "petroleum, chemical smell on him." She had bruises on her neck which she attributed to the man's having sucked on her neck or "whatever he was doing." He

---

[2] She and her daughter were preparing to move, and most of their belongings were packed. Her daughter was spending the night with someone else.

told her that he lived in her apartment complex and had been watching her for a long time.

GBI DNA analyst Goff conducted testing on the vaginal swabs from C. Robinson and Bluain's blood, finding matches. He opined, based on his testing and computer-conducted statistical analysis, that only "one in one billion" African-American men would have sperm matching this DNA pattern.

On October 2, 1992, DeKalb County Undercover Officer Violette was conducting surveillance at a Starvin' Marvin store at the intersection of Pleasantdale and Britt Roads, no more than a mile from the residence of V. Robinson. It was around 10:30 p.m., and Violette was parked in an unmarked car at a Jiffy Lube next to the store, approximately 40 feet from the well-lighted fuel pumps. He observed a Pontiac Sunbird matching the description of the one he was looking for stop, back up, make a U-turn, and pull next to a car parked at the pumps. The African-American male driver got out of his car and crouched over, attempting to enter the other car, which was locked. Officer Violette observed his profile for approximately five seconds and said the man's facial features "stuck out" and were "easily identifiable to me." The man then jumped into his car and left at a high rate of speed, pursued by Violette and uniformed officers and marked cars. The Pontiac Sunbird crashed into a ditch, and the driver escaped. Found in the car were binoculars, two packs of pantyhose, a camera and case, a screwdriver set, a watch, a white purse, a pack of unopened Lifestyles condoms, a package of opened Lifestyles condoms, food stamps, and a bottle of cologne. After Bluain's arrest, Violette was shown a photo spread on August 26, 1996. It had been prepared by the detective investigating the sexual assaults. Violette studied the array and identified Bluain as the man he saw at the Starvin' Marvin in 1992. He stated that he was "pretty positive" in his identification.

On July 9, 1996, around 4:30 a.m., Clayton police officer Monteau was dispatched to a possible prowler call. He arrived at the address at 4:41 a.m. and was met by Mr. and Mrs. Smith, who ran out their front door and said the man was running through the back yard. The officer pursued and saw a flashlight in the man's hand. He momentarily lost sight of the man but stood still and heard a rustling in the brush. Although he saw Bluain lying in the brush, he radioed that he had lost the prowler. Then, he and another officer rushed Bluain's location. Although Bluain ran, he was eventually captured. A mid-size flashlight was found on the ground where he was caught. A flat head screwdriver, a Lifestyles condom, jewelry, and cash were found on Bluain. A screen had been removed from a rear window of

the Smiths' home, and pry marks were found on the window.[3]

Bluain's sole argument regarding sufficiency of the evidence of all the counts except the kidnapping with bodily injury is that the evidence was "contradictory and conflicting." Conflicts in testimony of witnesses, including the State's witnesses, are a matter of credibility for the jury's resolution. *Howard v. State*, 227 Ga. App. 5, 8 (6) (a) (488 SE2d 489) (1997). Here, although conflicting, there was competent evidence to support the burglary and rape counts (V. and C. Robinson), the aggravated sodomy of V. Robinson (oral sex), and the attempted aggravated sodomy of V. Robinson (anal sex). *Jackson*, supra; *Shelnutt v. State*, 234 Ga. App. 655, 656 (2) (506 SE2d 643) (1998).

With regard to the kidnapping with bodily injury count, Bluain argues that the State failed to prove any bodily injury of C. Robinson aside from the rapes committed against her. The State agreed, and the court instructed the jury that an injury aside from the rapes was necessary to constitute kidnapping with bodily injury. OCGA § 16-5-40 (b).

C. Robinson testified that she had bruises on her neck. Although she attributed them to the sucking or "whatever he was doing," there was also evidence that he kept his hand tightly around her neck while he moved her from room to room. "Any physical injury, however slight, suffices to support a conviction of kidnapping with bodily injury. [Cit.]" *McDougal v. State*, 239 Ga. App. 808, 809 (1) (521 SE2d 458) (1999) (scratches or abrasions sufficient). See also *Roberson v. State*, 219 Ga. App. 160, 162 (2) (464 SE2d 262) (1995) (bruising sufficient); *Ferguson v. State*, 211 Ga. App. 218, 221 (3) (438 SE2d 682) (1993) (choking sufficient).

The evidence was legally sufficient. *Jackson*, supra.

2. In his first enumeration of error, Bluain contends that the DNA evidence was improperly admitted because there was insufficient proof that the general scientific principles and techniques involved in the testing were capable of producing reliable results and that the DNA testers themselves substantially performed the scientific procedures in an acceptable manner, as required by, e.g., *Johnson v. State*, 264 Ga. 456, 458 (5) (448 SE2d 177) (1994).

To the contrary, a substantial record was made both before trial and during the trial regarding DNA testing by the GBI. Goff, a DNA analyst who conducted the restriction fragment length polymorphism (RFLP) testing on the samples of Bluain and C. Robinson, testified at length regarding the protocols and methodology used in

---

[3] It was stipulated that Bluain pled guilty to criminal attempt to commit burglary, possession of burglary tools, and obstruction of an officer as a result of his attempt to enter the Smiths' home and the ensuing chase.

extracting, fragmenting, testing, and matching the DNA fragments. See generally *Caldwell v. State*, 260 Ga. 278 (1) (393 SE2d 436) (1990). RFLP testing has been accepted in this state. *Chapel v. State*, 270 Ga. 151, 156 (5) (510 SE2d 802) (1998).

Fyffe was the DNA analyst who conducted the polymerase chain reaction (PCR) testing on the samples of Bluain and V. Robinson. She also testified at length on the protocols and methodology of this method of testing. This method has also been accepted as valid in this state. *Redding v. State*, 219 Ga. App. 182, 184 (4) (464 SE2d 824) (1995).

The trial court did not err in admitting the results. The deficiencies argued below by Bluain, lack of national accreditation of the GBI lab by the National Association of Crime Lab Directors and failure to use the "highest standards" in testing, went to the weight of the testing results and not their admissibility. *Chapel*, supra; *Ross v. State*, 231 Ga. App. 793, 801 (14) (499 SE2d 642) (1998); *Redding*, supra.

3. In his second enumeration of error, Bluain contends that the trial court erred in not granting his motion to sever the counts involving V. Robinson from those involving C. Robinson. The indictment against Bluain originally contained not only those counts but 15 other counts involving additional rapes and assaults against other victims. Only those involving V. and C. Robinson occurred in private homes, while the others occurred in public places and involved two victims at a time.

A written motion to sever was filed and sought severance of the counts involving each victim from counts involving any other victim. At the hearing on the motion, however, Bluain's argument was directed at severing Counts 9 through 23 from Counts 1 through 8 on the ground that the latter involved residential settings while the others involved public places and multiple victims. Counsel asked the court to "sever out those two [victims]."

Counsel for the State then agreed to sever the first eight counts from the remaining counts if the State could introduce the circumstances of Bluain's arrest.

Since the case was tried as to only the two Robinson victims, as requested by Bluain at the hearing, there is no error for this Court to review.

Even pretermitting this issue, however, because of the similarities in the two assaults, although they were not identical, the evidence regarding each would have been admissible in the trial of the other even if they had been severed. *Scroggins v. State*, 237 Ga. App. 122, 124 (3) (514 SE2d 252) (1999); *Redding*, supra at 184 (3).

4. Bluain also contends that the trial court erred in allowing the items found in the abandoned Sunbird on October 2, 1992, to be admitted into evidence.

This error, however, is not the subject of an objection appearing below on the record, and there is nothing in this regard for our review. Although there is a notation during the testimony of Detective Brown, the officer who seized the items, of a bench conference requested by Bluain's trial counsel, the record does not contain this bench conference. Had Bluain desired that we consider this objection, steps should have been taken to ensure that the court reporter took down the conference or the objection restated into the record after this conference. *Spivey v. State*, 237 Ga. App. 626, 627 (1) (516 SE2d 332) (1999); *Prine v. State*, 237 Ga. App. 679, 680, n. 1 (515 SE2d 425) (1999).

*Judgment affirmed. Ruffin and Ellington, JJ., concur.*

DECIDED JANUARY 31, 2000.

*Lynn M. Friedewald*, for appellant.

*J. Tom Morgan, District Attorney, Jeanne M. Canavan, Maria Murcier-Ashley, Thomas S. Clegg, Assistant District Attorneys*, for appellee.