A02A2216. STEWART v. THE STATE.
(576 SE2d 93)

PHIPPS, Judge.

A Chatham County jury found James Stewart, Jr. guilty of aggravated battery, two counts of rape, attempted rape, kidnapping with bodily injury, aggravated sodomy, and two counts of aggravated assault. After the denial of his motion for new trial, Stewart filed this appeal. Stewart challenges the sufficiency of the evidence, the denial

---

[10] *Whorton v. Boatwright*, 233 Ga. App. 369, 371 (504 SE2d 216) (1998).

of his motion to sever, and an adverse finding on his ineffectiveness claim. Because we find no merit in these claims, we affirm.

Stewart was prosecuted under a sixteen-count indictment for crimes involving five different female victims. The indictment charged Stewart with the rape or attempted rape of each victim while using violence constituting aggravated battery or aggravated assault. During the trial, due to the State's inability to locate two of the victims, the court directed a verdict on the eight counts relating to them. The other three women testified against Stewart, and he was convicted on the eight remaining counts.

On appeal, Stewart no longer enjoys a presumption of innocence and the evidence must be viewed in a light most favorable to the jury's verdict.[1] When so considered, the evidence established that as C. B. was walking toward her sister's house, a man later determined to be Stewart drove by and offered her a ride which she accepted. When he detoured, saying he was taking her to his house, C. B. protested. Stewart then drove to a deserted, wooded area. Threatening to kill C. B. if she did not comply, he ordered her to undress. C. B. testified that when her assailant attempted to forcibly engage in sexual intercourse, a struggle ensued, and "[h]e put it in, but we fought and his came out." C. B. denied wanting to engage in the sexual activity. When he left the car to urinate, C. B. tried frantically to lock herself inside his car. As Stewart reached through a partially opened window to unlock a door, C. B. found a "Club," a steering wheel anti-theft locking device, and used it to strike at his hands. Becoming enraged, Stewart said, "[b]itch, I'm fixing to kill you now." He grabbed the Club and began beating her. In a fruitless effort to escape, C. B. ran into the woods. When C. B. stumbled and fell into a ditch, he caught up with her and resumed hitting her with his fists and the Club. During this savage beating, C. B.'s right eye was mangled, permanently disfiguring her face. Cursing her, Stewart again threatened to kill her. Somehow, C. B. managed to get away. Cold, naked, and bleeding, C. B. remained hidden for some time in the woods, afraid that he would kill her.

When C. B. finally emerged from her hiding place in the woods, she found a dilapidated car and removed a piece of carpet to cover herself. She began walking "on the highway" to find help. After midnight, when Derrick Walker drove past C. B., he was shocked by the image of a bloody person who "was very, very, very, very badly beaten." Walker testified,

> [a]s the person came closer to the car, blood was — like I said — blood was everywhere. I actually had blood on the

---

[1] See *Pollard v. State*, 230 Ga. App. 159 (495 SE2d 629) (1998).

windows from where [she] was touching the windows. . . . Then her eye just fell. Her eye fell out of the socket. And at that point there, I panicked and I ran to the hospital as quick as my car would let me go. I ran through red lights. I felt that it was just that type of emergency, to go find help as quick as I could.

When Walker arrived at the hospital, he "begged and pleaded" for assistance. Following an ambulance, Walker doubled back to the scene to make certain the emergency crew could find her. Walker feared that her attacker "really wanted her for dead" and would return to finish killing her.

In the meantime, C. B. managed to flag down another motorist, Walter Boone. When Boone saw her, he knew "something was wrong" and noticed "[h]er face looked like it — looked like hamburger meat." Boone testified that C. B. was naked except for a rug or carpet she had wrapped around herself. Boone rushed C. B. to a hospital where he learned that personnel seemed to be anticipating her arrival.

The next victim, V. B., recounted how one night, while walking to a nearby store, she encountered Stewart, who began walking with her. Although Stewart initially had seemed "nice" and nonthreatening, when V. B. refused to engage in sexual activity "[h]is personality changed." When V. B. tried to run, Stewart attacked her from behind, grabbing her hair and punching her in the face. V. B. testified that Stewart took her underneath a vacant house where he raped her. Afterward, he took her to a place resembling an "outhouse, like a shack." When Stewart again told her to take off her clothes and she resisted, "[t]hat's when the real blows really started." V. B. testified that using a closed fist, Stewart hit her repeatedly in her mouth, head, and face, triggering fear that she was not "going to be able to walk away from this situation alive." Stewart, she testified, would not allow her to leave, forcing her to remain naked inside the unheated shed for the remainder of the night. V. B. identified Stewart in court as her assailant.

V. B.'s mother testified that when her daughter arrived home in the morning, she looked "beaten bad, bruised." Immediately, she called a friend to take her and her daughter to a hospital. A sexual assault nurse examiner testified that V. B. had extreme external swelling and tenderness in the vaginal area and had significant internal swelling as well. V. B.'s mouth was swollen, and she had bruises on her face. The nurse recalled V. B.'s complaints about the interior of a shed having been extremely cold.

The third victim, Y. P., testified that when Stewart suggested trading "dope" for sex, she readily agreed. She balked, however, when Stewart said, "[l]et's do it." When Y. P. insisted on seeing the drugs

first, Stewart "popped" her in the head with his fist. Y. P. said that she tried to fight but he dragged her to a shed. She denied going there willingly and identified this shed from a photograph. It was the same dilapidated shed that V. B. had recognized and identified. Y. P. testified that Stewart, whom she identified in court as her attacker, kicked her in the back, grabbed her around the neck, and struck her in the head with his fist. Y. P. testified that Stewart "kicked me with his boots, beat me up good, so I decided to give up." Y. P. testified that after being compelled to engage in sexual intercourse, "I lied to get away from him." Then, when she got to her mother's home, "I fell in the door with my mama and cried." Her mother took Y. P. to a hospital where photographs were made which document her obvious physical injuries.

At a *Jackson-Denno* hearing, the trial court considered the admissibility of a videotaped custodial interview of Stewart taped after his arrest for the rape of V. B. The videotape depicts Stewart being advised of his rights and signing a waiver of rights form. The trial court determined that the waiver was voluntary and the videotape admissible. During this videotaped interview, Stewart made numerous incriminating comments. He admitted taking women to the shed but claimed they were prostitutes or "crack heads" trading sex for money or drugs. Stewart admitted hitting a few women with his fist and one with a brick. Stewart recalled that after one woman hit him, he "went ballistic" and "I hit her with a brick." He corroborated major details of the victims' accounts, confirming the sexual activity that occurred beneath an old abandoned house, the struggle over the Club, and the occurrence of sexual activity inside the shed. Stewart described the shed as "[n]ormally, that's the spot that I take them." When specifically asked, "have you ever got in a fight over that [Club] thing?" Stewart responded, "Yeah. Yeah, I think I did. A girl — my Club. The girl took my Club. Yeah, she took the Club and hit me." But Stewart said he could not recall whether he had hit her afterward. Stewart confirmed that he used to drive his father's gray Oldsmobile Cutlass that had a Club device. After being told that "[t]he girl involved in the Club [incident] says . . . guy in a gray car," and being asked, "[w]hat happened to that Cutlass you had?" Stewart replied that he had gotten "rid of it." Stewart tried to justify his anger and violence toward the women whom he referred to as "freaks," explaining "well, I had reason for it," claiming that each had tried to steal his money or wallet or had hit him without provocation.

Photographs of all three women's visible physical injuries were entered in evidence. In addition, the trial court admitted evidence of a similar incident involving yet another victim, J. D. At this trial, J. D. recounted how Stewart had invited her to watch television at his house but had taken her to a shed instead. She testified that

when she had tried to walk away, Stewart covered her mouth and "started hitting me, boxing me in my face." J. D. denied that the sexual activity with Stewart was consensual. When freed, she went to her sister's house where she called the police. Afterward, she obtained medical treatment at a hospital. Stewart was indicted for rape, kidnapping with bodily injury, and aggravated assault with intent to rape J. D. But, on the day before that trial, J. D. balked, expressing a strong disinclination to testify, so the State reluctantly had entered into a negotiated plea agreement with Stewart. As part of the deal, Stewart pleaded guilty to aggravated assault with intent to rape. The other counts were nolle prossed. Certified copies of the indictment and conviction were entered in evidence in this trial.

1. Stewart claims the verdict is strongly against the evidence and lacking in evidentiary support. He points out that C. B. was unable to identify her attacker and that V. B. and Y. P. admitted lying to investigators and hospital personnel.

Both V. B. and Y. P. identified Stewart in court as their attacker. Both testified that Stewart took them against their will to a shed where he sexually assaulted them. Both testified that he struck them with his fists. Whether these two victims' accounts contained material inconsistencies or whether their recollections were, in fact, clouded by the consumption of drugs or alcohol evoked issues of veracity and credibility for the jury to resolve.[2] Similarly, it was for the jury to decide what weight, if any, to afford the similar incident described by J. D. in which Stewart had forced her into a shed and "boxed" her in the face when she refused to submit to him.

As to C. B., Stewart was convicted of aggravated battery and attempted rape. It is true that C. B., who lost the sight in one eye and was severely traumatized by the events, could not definitely identify her attacker. Nevertheless, C. B. was able to supply crucial details about the location of the attack, the perpetrator's car, and the Club. C. B. described her resistance, the struggle over the Club, the ensuing beating, and the attempted rape. Moreover, in the videotaped statement, Stewart implicated himself in these crimes by confirming certain facts. Stewart admitted that he used to drive a gray car that had a Club device. Stewart recalled getting into a fight over the Club after "[the girl] took the Club and hit me." He also admitted taking the "girl" to the same place where C. B. said the attack occurred. We find the evidence sufficient, within the meaning of *Jackson v. Virginia*,[3] to sustain the convictions at issue beyond a reasonable doubt.

2. Stewart asserts that the trial court's failure to sever the offenses denied his right to due process and deprived him of a fair

---

[2] See *Sanders v. State*, 252 Ga. App. 609, 611 (1) (556 SE2d 505) (2001).
[3] 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

trial under both the state and federal constitutions. Contending that severance was mandatory, Stewart argues that the crimes were not connected and lacked any common element.

> The decision to grant a severance rests within the sound discretion of the trial judge, who may balance the interests of the state and the accused by considering such factors as whether the same evidence would be necessary and admissible in each count, and whether the joining of counts in one trial might confuse the jury.[4]

Absent an abuse of that discretion, this court will not disturb the trial court's decision.[5] Moreover, a trial court does not abuse its discretion in denying the motion for severance when evidence of one crime would be admissible in the trial of the other crime.[6]

Here, the rapes of V. B. and Y. P. and the attempted rape of C. B. that formed the centerpiece of the charges against Stewart were sufficiently similar so that evidence from each victim would have been admissible in the other trials had the cases been tried separately.[7] In each situation, Stewart befriended his intended female victim and then took her to an isolated place where if she rejected his sexual advances, his demeanor and conduct would transform. By striking his victim in the face with his fist, he would then subdue each woman by the use of physical violence. If she resisted, he would escalate the physical violence until she desisted. Clearly, these facts form a pattern so similar that even if the three cases had been severed, each would have been admissible in the other cases as evidence of a similar transaction.[8] Accordingly, the trial court did not abuse its discretion in denying the motion for severance.[9]

3. Citing two grounds, Stewart asserts that he was deprived of his constitutional right to effective assistance of counsel.

To establish an ineffectiveness claim, an appellant must show not only that his trial counsel's performance was deficient but also that the deficiency prejudiced him.[10] The trial court's finding on the issue of ineffectiveness must be upheld unless it is clearly erroneous.[11]

---

[4] (Citations omitted.) *Gilbert v. State*, 163 Ga. App. 688, 690 (3) (295 SE2d 173) (1982).
[5] *Smith v. State*, 249 Ga. App. 39, 40 (1) (547 SE2d 598) (2001).
[6] *Houston v. State*, 242 Ga. App. 300, 302 (2) (529 SE2d 431) (2000).
[7] See *Rocha v. State*, 234 Ga. App. 48, 53 (5) (506 SE2d 192) (1998).
[8] See id.
[9] See *Redding v. State*, 219 Ga. App. 182, 184 (3) (464 SE2d 824) (1995).
[10] *Ward v. State*, 242 Ga. App. 246, 248 (2) (529 SE2d 378) (2000).
[11] *McCant v. State*, 234 Ga. App. 433, 436 (3) (506 SE2d 917) (1998).

(a) Stewart claims that his trial counsel failed to object to the similar transaction evidence and thus waived the issue for appeal. He contests the similarity of the prior incident and argues his counsel's error was critical because the three complainants admitted lying to investigators and to having consumed alcohol or drugs.

The State notified Stewart of its intent to offer evidence about two similar incidents. Before trial, the court held a hearing on the issue, and after listening to the State's proffer, the court determined that the two prior incidents were sufficiently similar and admissible. After that ruling, defense counsel objected to the admission of that evidence, but did not object at trial. "Even though a defendant challenges similarity at the pretrial hearing, he waives this ground by failing to assert it when the evidence is introduced at trial."[12] Therefore, trial counsel's inaction resulted in a waiver of this issue.

At trial, the State offered only the evidence from one similar incident — the one involving J. D., to which Stewart had entered the negotiated guilty plea. As noted above, the details of Stewart's actions in the incident with J. D. bore remarkable similarity to those for which Stewart was being tried. In any event, in light of the overwhelming evidence of Stewart's guilt, reversal on the basis of the admission of this evidence would not be warranted even had the issue been properly preserved.[13]

(b) Stewart complains that his trial counsel did not file a motion in limine to preclude the State and its witnesses from using the word "rape." He claims that V. B.'s testimony that "he raped me" and Y. P.'s mention of her "rape examination" at the hospital prejudiced his defense. He argues that the prosecutor's repeated use of "the word 'rape' in opening and closing arguments" was "very prejudicial" to him.

Despite Stewart's claim that the sexual activity was consensual, his trial counsel did not file a pretrial motion in limine requesting the State to refrain from using the term "rape" to describe the events.[14] The unrestricted use of the word "rape" may be objectionable, absent some jury instruction that the question of whether a rape occurred is for the jury to resolve.[15] "Reference to an incident as rape states a conclusion usually to be determined by the jury."[16] While a pretrial motion could have been filed, here, as in *Glass v. State*,[17] we do not find that counsel's failure to file that motion constitutes inef-

[12] *McClarity v. State*, 234 Ga. App. 348, 349 (2) (506 SE2d 392) (1998).

[13] See *Moore v. State*, 242 Ga. App. 249, 251 (1) (a) (529 SE2d 381) (2000).

[14] At the motion hearing, his counsel explained that the term "rape" appeared several times on the videotape so to object "would just draw attention to it."

[15] *Arnold v. State*, 166 Ga. App. 313, 317 (7) (304 SE2d 118) (1983).

[16] Id.

[17] 255 Ga. App. 390, 403 (10) (e) (565 SE2d 500) (2002).

fective assistance. In instructing the jury, the trial court clearly framed the distinction between consensual sexual activity and the crime of rape. The trial court's finding that Stewart was afforded effective assistance is not clearly erroneous and must be affirmed.[18]

*Judgment affirmed. Andrews, P. J., and Mikell, J., concur.*

DECIDED JANUARY 9, 2003 — 

*Martin G. Hilliard*, for appellant.

*Spencer Lawton, Jr., District Attorney, Nancy G. Smith, Assistant District Attorney*, for appellee.

---

[18] See *Kelly v. State*, 267 Ga. 252, 253 (2) (477 SE2d 110) (1996).