897 So.2d 419 (2004)
J.H.H.
v.
STATE of Alabama.
CR-02-1752.
Court of Criminal Appeals of Alabama.
January 30, 2004.
Rehearing Denied March 19, 2004.
Certiorari Denied September 17, 2004.
*420 Thomas Woodrow Hinote, Tuscaloosa, for appellant.
Troy King and William H. Pryor, Jr., attys. gen., and Jack W. Willis, asst. atty. gen., for appellee.
Alabama Supreme Court 1031004.
SHAW, Judge.
The appellant, J.H.H., was indicted for, and convicted of, burglary in the first degree, a violation of § 13A-7-5, Ala.Code 1975; attempted rape in the first degree, a violation of §§ 13A-6-61 and 13A-4-2, Ala.Code 1975; and sexual abuse in the first degree, a violation of § 13A-6-66, Ala.Code 1975. J.H.H. was sentenced, as a habitual felony offender, to life imprisonment for the burglary conviction, to life imprisonment for the attempted-rape conviction, and to 30 years' imprisonment for the sexual-abuse conviction. The life sentences were to run consecutively and the 30-year sentence was to run concurrently with the first life sentence.
At trial, the State presented DNA evidence obtained from scrapings taken from the victim's fingernails.[1] The only issue raised on appeal is whether the trial court abused its discretion when it overruled J.H.H.'s objection to the admission of this DNA evidence. Specifically, J.H.H. contends that DNA evidence was not admissible because, he says, "it is clear from the testimony presented in support of its admission that it completely fails the reliability prong of the Daubert [v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)] test." (J.H.H.'s brief at p. 14.)
We note that J.H.H.'s first trial in September 2002 ended in a mistrial when the jury told the trial court that it was hopelessly deadlocked and was unable to reach a verdict. At the beginning of his second trial in May 2003, the parties stipulated that "all of the evidence heard in the [Ex parte] Perry [, 586 So.2d 242 (Ala.1991)] hearing of the previous trial of this case would be incorporated into the proceedings in this case as if they had been conducted herein."[2] (R. 137.)
On appeal, J.H.H. argues the following:
"In the present case, it is clear that the proffered evidence failed to meet the reliability standard of the Daubert test. At the time of the testing performed in this case, the State Crime Lab [Alabama Department of Forensic Sciences laboratory] had lost its accreditation [from the National Forensic Science Technology Center]. According to the testimony of the State's witness, the loss of accreditation was due to two issues within the lab itself. First, the director of the lab lacked the necessary educational credentials to hold that position. Further, there was no written training manual which outlined the training procedures required to certify new laboratory technicians. While this issue had been corrected prior to this trial, it clearly calls into question the proficiency and testing methodology present at the time the analysis in this case was performed.
"... Given the question raised as to the reliability of [the DNA] evidence by the State's own witness, it is clear that *421 the evidence should not have been allowed."
(J.H.H.'s brief at p. 20.)
In addressing J.H.H.'s argument on appeal, the State asserts the following:
"The Daubert standard has been adopted by the State of Alabama and its two-part analysis is the criteria for the admissibility of DNA evidence in the State of Alabama. Under the test, the State must show that (1) the theory and the technique on which the proffered DNA evidence is based is reliable and (2) the theory and the technique on which the proffered DNA evidence is based are relevant to the understanding of the evidence or to determine a fact in issue. [J.H.H.] does not challenge the relevancy requirement. Only if a party challenges the performance of a reliable and relevant technique and shows that the performance was so particularly and critically deficient that it undermined the reliability of the technique will evidence that is otherwise reliable be deemed inadmissible.
"The reliability requirement requires a party proffering the scientific evidence to establish that the evidence constitutes scientific knowledge. The trial court focuses its inquiry on the expert's principles and methodology, not on the conclusions they generate. Thus, the reliability inquiry addresses the scientific validity of the principle asserted, that is, whether the principle supports what it purports to show.
"The accreditation of the laboratory was deficient because the technical leader had not completed required educational prerequisites. Additionally, the laboratory did not have a training manual for new technicians.... Thus, unless [J.H.H.] proved the performance of the test was affected by the lack of accreditation to the point that the performance was particularly and critically deficient and undermined the reliability of the technique, the tests were admissible.
"None of the factors that were deficient in the accreditation process affected the methods or the performance of the DNA tests. The same tests and methods were used before and after accreditation [was] lost and reinstated. The accreditation body found no deficiencies in any of the tests conducted by the laboratory. At best, the deficiencies of the State laboratory could only be seen as `technical' deficiencies. The lack of [accreditation] went to the weight of the evidence and not to its admissibility. This is in accord with other state and federal jurisdictions addressing this specific issue.
"....
"... Specifically, [J.H.H.] argues that the State crime lab was not accredited when it performed part of the DNA testing in the present case and the lack of accreditation called into question the proficiency and the testing methodology used by the lab in performing the test. Matters concerning accreditation address the weight of the evidence, not its admissibility.
"The Alabama Supreme Court in Turner v. State, 746 So.2d 355 (Ala.1998), set out the guidelines for the admission of DNA results. The court stated:
"`[I]f the admissibility of DNA evidence is contested, the trial court must hold a hearing, outside the presence of the jury, and, pursuant to § 36-18-30, determine whether the proponent of the evidence sufficiently establishes affirmative answers to these two questions:
"`I. Are the theory and the technique (i.e., the principle and the methodology) on which the proffered DNA forensic evidence is based "reliable"?

*422 "`II. Are the theory and the technique (i.e., the principle and the methodology) on which the proffered DNA evidence is based "relevant" to understanding the evidence or to determining a fact in issue?
"`Trial courts should use the flexible Daubert analysis in making the "reliability" (scientific validity) assessment. In making that assessment, the courts should employ the following factors: (1) testing; (2) peer review; (3) rate of errors; and (4) general acceptance.
"`Trial courts should make the "relevance" assessment by addressing the "fit" between what the scientific theory and technique are supposed to show and what must be shown to resolve the factual dispute at trial. Whether otherwise reliable testing procedures were performed without error in a particular case goes to the weight of the evidence, not its admissibility. Only if a party challenges the performance of a reliable and relevant technique and shows that the performance was so particularly and critically deficient that it undermined the reliability of the technique, will evidence that is otherwise reliable and relevant be deemed inadmissible.'
"Turner v. State, 746 So.2d at 361-62 [(emphasis added)(footnotes omitted)]; Adams v. State, [CR-98-0496, August 29, 2003] ___ So.2d ___, ___ (Ala.Crim.App.2003).
"[J.H.H.] challenges only the finding by the trial court that the DNA evidence was shown to be reliable. He contends that the evidence shows that the results of the tests were unreliable because the State forensic laboratory was not accredited at the time it performed the DNA analysis on the fingernail scrapings. The State laboratory was not accredited because the technical leader lacked academic requirements for her position and the lab did not have a training manual for new analysts. Although the appellate courts of this State have not specifically addressed the issue of the accreditation of a state forensics lab, other jurisdictions have addressed the issue and ruled that matters of accreditation affect the weight of the evidence and not its admissibility."
(State's brief at pp. 13-18.)
At the Ex parte Perry, 586 So.2d 242 (Ala.1991), hearing, J.H.H. argued that the State had failed to meet the third prong of the Perry test  "In this particular case, did the testing laboratory perform generally accepted scientific techniques without error in the performance or interpretation of the tests?" Ex parte Perry, 586 So.2d at 250  because, he said, the laboratory was not accredited when it performed these DNA tests in his particular case. However, in Turner v. State, 746 So.2d 355 (Ala.1998), the Alabama Supreme Court stated:
"In this case, the Court of Criminal Appeals held that the Legislature's enactment of § 36-18-30 did not affect the three-pronged Perry test. 746 So.2d 352, 353 (1996). Specifically, the Court of Criminal Appeals held that the third prong of the Perry test, which requires the expert to establish that the generally accepted scientific techniques were performed in the particular case without error, survived the enactment of § 36-18-30. 746 So.2d at 353. We disagree.
"....
"... Unlike Perry, 586 So.2d at 250, Daubert does not require the accuracy of the testing in the particular case to be assessed at the admissibility stage.
"... Moreover, in United States v. Beasley, 102 F.3d 1440, 1446-47 (8th Cir.1996), cert. denied, 520 U.S. 1246, 117 S.Ct. 1856, 137 L.Ed.2d 1058 (1997), *423 the Eighth Circuit held that under Daubert the defendant's argument concerning the laboratory's testing of the DNA in his particular case went to the weight of the evidence, not its admissibility. Id., 102 F.3d at 1448. Under Daubert, a party's challenge to the performance of a reliable and relevant scientific technique in a particular case should warrant exclusion of the scientific evidence only if the `"reliable methodology was so altered ... as to skew the methodology itself."' Id. (quoting United States v. Martinez, 3 F.3d 1191, 1198 (8th Cir.1993), cert. denied, 510 U.S. 1062, 114 S.Ct. 734, 126 L.Ed.2d 697 (1994))."
Turner, 746 So.2d at 360-61 (footnote omitted). See Adams v. State, [Ms. CR-98-0496, August 29, 2003] ___ So.2d ___, ___ (Ala.Crim.App.2003)("This holding [in Turner] is in accord with the majority of other states that have likewise held that errors in the performance of the DNA testing procedure go to the weight and not the admissibility of the DNA evidence."); Lewis v. State, 889 So.2d 623, 669 (Ala.Crim.App.2003)(quoting pertinent portions of Turner, 746 So.2d at 358-61, wherein "the Alabama Supreme Court explained the test for the admissibility of DNA evidence as set out in Daubert.").
At the Perry hearing, Larry Huys, the head of the forensic-biology section at the Alabama Department of Forensic Sciences testified regarding the DNA analysis of the scrapings taken from the victim's fingernails. Huys testified that the laboratory uses a three-step process  extraction, amplification, and visualization  in its DNA testing and that these same testing procedures are commonly used in other forensic DNA laboratories in this country and around the world, including the Federal Bureau of Investigation crime lab, and that the Alabama Department of Forensic Sciences laboratory follows nationally recommended guidelines/controls in performing its DNA procedures. Additionally, Huys testified:
"[Prosecutor]: In the DNA tests that you performed in this particular case, did the controls that you talked about earlier indicate any errors that may have occurred in your analytical process?
"[Huys]: No.
"[Prosecutor]: Now, if the tests come back inconclusive, what do you do?
"[Huys]: If they come back  if a test would come back inconclusive, there would be no results to publish.
"A test can come back three different ways in the field of forensics. We have a little bit different approach to analysis in forensics than I guess what you might call the academic world. You can have a positive result, some type of reading where you can get an answer. You can have no result at all or you can have an inconclusive result, in which case you would not publish an answer either.
"[Prosecutor]: You did in fact publish an answer in this case. Did that indicate there was a positive result?
"[Huys]: That indicated there was a positive result and that all the controls functioned as expected.
"[Prosecutor]: The controls you used, were they run simultaneous with the tests in this case?
"[Huys]: Every time, yes, sir."
(R. 36.)
Huys testified that the laboratory is currently accredited by the National Forensic Science Testing Center which accredits to the FBI standards, but that it temporarily lost its accreditation between July 2001 and March 2002. He stated that the laboratory temporarily lost its accreditation for two reasons  the technical leader did not meet certain educational requirements and *424 the laboratory did not have a written training manual to train new analysts. Huys testified that the laboratory followed the procedures dictated in its procedure manual to conduct the DNA testing in the present case; that the certifying agency did not find any deficiencies in the laboratory's procedure manual; and that the procedures used in the present case were the same procedures used before the laboratory lost its accreditation and after the laboratory regained its accreditation. During the Perry hearing, the following exchange occurred between the trial court and Huys:
"THE COURT: Okay. Mr. Huys, I think I want to distill this to its simplest form; and that is, was the fact of your accreditation  did it impact on the reliability of the results you did for this DNA testing?
"[Huys]: No, sir.
"THE COURT: Why is that? How can you assure the Court that it did not?
"[Huys]: The procedure manual was found to be without problem when it was audited. And by the procedure manual, I mean the test method that we use for producing results on a daily basis. Those controls all functioned as expected and they passed, as I said, muster, if you will, by the accrediting agency both before and after the  on the first and second audits. And as I said, the controls functioned and that's really the strongest indicator whether or not the test is functioning properly.
"....
"THE COURT: Well, maybe that answers this question, but have there been occasions when the lack of accreditation may have directly affected the DNA test results?
"[Huys]: No, sir. The issues that were  we were found to be lacking in were academic requirements of the technical leader, which don't really speak to the performance abilities of the analysts, and then the training manual. The need to have a training manual for new analysts  even having the manual doesn't mean that the analysts were trained badly. It simply now puts it in paper  on paper how that training occurs.
"THE COURT: Do you know whether or not any analysts involved in the testing in this case had been trained pursuant to the training manual that was not  well, was affected in any way by the lack of having a training manual?
"[Huys]: No, sir. As I said the training occurs in the same fashion. It's just now documented in a more  on paper and in a more regimented fashion."
(R. 99-101.)
At the Perry hearing, Dr. Ronald T. Acton, a professor in the departments of microbiology, medicine, and epidemiology and international health at the University of Alabama at Birmingham, testified on behalf of J.H.H. Dr. Acton testified that he did not do any actual independent testing in the present case because there was no original evidence  fingernail scrapings  left to test. However, Dr. Acton testified that he did review the laboratory's bench notes  step-by-step written documentation of the tests conducted by the laboratory and the results of those tests  and that his review of the bench notes revealed that the laboratory did not make any obvious errors during the testing, that the laboratory followed its procedure manual, and that "the actual results that they obtained, I looked at the electrophoretograms, the profile  the DNA profile, and I would agree that based on those electrophoretograms that the allele assignments they made, I agree with those. And those were consistent between evidence and suspect." (R. 120-21.)
*425 As previously noted, J.H.H.'s contention was that the DNA evidence in this case should not be admitted because, he said, it could not be deemed reliable in light of the fact that the laboratory had lost its accreditation at the time it conducted the tests in his case. At the Perry hearing, the following exchange occurred:
"THE COURT: Are you saying that the failure to be [accredited] in and of itself, without regard to whether or not the reasons which the  Mr. Huys has testified to which as I understand it from his testimony did not impact negatively on the tests in this case, the failure in and of itself to have accreditation should lead this Court to find that the State did not satisfy the third prong.
"[J.H.H.'s attorney]: Yes, sir, that in conjunction 
"THE COURT: Do you have any caselaw to that effect?
"[J.H.H.'s attorney]: No, sir.
"THE COURT: Okay. Now, so let me ask you, Mr. [Prosecutor].
"[Prosecutor]: Yes, sir.
"THE COURT: Do you have any caselaw one way or the other in that regard?
"....
"[Prosecutor]: I've searched and I cannot find any case which excluded DNA results for lack of accreditation."
(R. 130-32.) On appeal, J.H.H. does not cite any caselaw in support of his contention that the DNA results are inadmissible because the laboratory had lost its accreditation at the time it conducted the DNA tests in the present case. The State asserts in its brief that while the appellate courts of this State have not specifically addressed the issue of the accreditation of the forensics laboratory, other jurisdictions have addressed the issue and have determined that matters of accreditation affect the weight of the evidence, not its admissibility. See Bluain v. State, 242 Ga.App. 125, 130, 529 S.E.2d 155, 159 (2000)("The trial court did not err in admitting the results. The deficiencies argued below by Bluain, lack of national accreditation of the [Georgia Bureau of Investigation] lab by the National Association of Crime Lab Directors and failure to use the `highest standards' in testing, went to the weight of the testing results and not their admissibility."); Smith v. State, 702 N.E.2d 668, 673 (Ind.1998)("Fourth, defendant argues that the Indiana State Police laboratory lacks accreditation, and that this affects the reliability and admissibility of the evidence. However, the lab was accredited by the American Society of Crime Lab Directors in 1990. Furthermore, the lab runs its tests under controlled conditions, follows specific protocols, and conducts quality testing on the kits and the analysts. Any concerns in this respect go to the weight of the evidence, not its admissibility."); State v. Russell, 125 Wash.2d 24, 49, 882 P.2d 747, 766 (1994)("While accreditation and regulation may be desirable in the medical as well as the forensic setting, it is not necessary to bar the use of DNA technology until such safeguards are in place. `Although the court is not the ideal forum for ensuring quality science, the adversary process is a means by which those who practice "bad" science may be discredited, while those who practice "good" science may enjoy the credibility they deserve.' [Kamrin T.] MacKnight, [Comment, The Polymerase Chain Reaction (PCR): The Second Generation of DNA Analysis Methods Takes the Stand, 9 Santa Clara Computer & High Tech. L.J. 287,] at 341 [(1993)]."); United States v. Lowe, 954 F.Supp. 401, 420 (D.Mass.1996)("The potential for and significance of contamination, the adequacy of proficiency testing, accreditation, and the significance of whether a laboratory estimates error rates *426 all concern the issue of quality control. Absent evidence demonstrating that the particular quality control procedures followed by the FBI laboratory violated a statute, regulation or a generally accepted industry requirement, these issues impact the weight of the evidence rather than its admissibility."); People v. Lee, 212 Mich.App. 228, 273, 537 N.W.2d 233, 254 (1995)("Because there was no precedent for the regulation of forensic testing, the court concluded that, while regulation and accreditation might be desirable, the absence of either or both of them should not bar the admissibility of PCR  produced DNA evidence. [State v. Russell, 125 Wash.2d 24, 49, 882 P.2d 747, 760 (1994).]"). Our research has not revealed any case where the appellate courts of this State have addressed whether the laboratory's accreditation, or lack of accreditation, affects the admissibility of its DNA test results. However, we agree with these other jurisdictions that the accreditation status of the laboratory conducting the DNA tests, standing alone, does not render the test results inadmissible, but that the laboratory's accreditation status is a factor that can be considered by the trier of fact when assessing the weight it assigns to this evidence.
As previously noted, this Court stated the following in Turner, 746 So.2d at 361:
"Under Daubert, a party's challenge to the performance of a reliable and relevant scientific technique in a particular case should warrant exclusion of the scientific evidence only if the `"reliable methodology was so altered ... as to skew the methodology itself."' [United States v. Beasley, 102 F.3d 1440, 1448 (8th Cir.1996)] (quoting United States v. Martinez, 3 F.3d 1191, 1198 (8th Cir.1993), cert. denied, 510 U.S. 1062, 114 S.Ct. 734, 126 L.Ed.2d 697 (1994)).
"....
"... Whether otherwise reliable testing procedures were performed without error in a particular case goes to the weight of the evidence, not its admissibility. Only if a party challenges the performance of a reliable and relevant technique and shows that the performance was so particularly and critically deficient that it undermined the reliability of the technique, will evidence that is otherwise reliable and relevant be deemed inadmissible."
(Footnote omitted.) After reviewing the record, we cannot say that J.H.H. established that the laboratory's performance of the tests in this case was deficient just because the laboratory had lost its accreditation at the time that it conducted the tests and that this "deficiency" undermined the reliability of the techniques and methods used by the laboratory to such a degree as to render the DNA results in the present case inadmissible. In light of the foregoing, we find no abuse of discretion on the part of the trial court in its admission of the DNA evidence obtained from the scrapings taken from the victim's fingernails. Thus, the trial court's judgment is affirmed.
AFFIRMED.
McMILLAN, P.J., and COBB, BASCHAB, and WISE, JJ., concur.
NOTES
[1] There was only one victim in this case.
[2] In Ex parte Perry, 586 So.2d 242, 254-55 (Ala.1991), the Alabama Supreme Court stated that "if the admissibility of DNA evidence is challenged, the trial court should conduct a hearing outside the presence of the jury to address the considerations raised in this opinion."